[No. 35761. *En Banc.* September 21, 1961.]

L. D. RAGAN, *Appellant*, v. THE CITY OF SEATTLE *et al.*, *Respondents.*\*

Byron D. Coney, for appellant.

A. C. Van Soelen, Robert Leslie, and William S. Howard, for respondents.

HILL, J.—We are here concerned with the constitutionality[1] of an ordinance regulating the licensing of juke-box operators.

The attack on the ordinance is made under the declaratory judgment act by L. D. Ragan, who owns a tavern in the city of Seattle and has a duly licensed juke box on his premises which he leases from a licensed-Mechanical-Music-Machine operator. He desires to purchase and operate his own juke box in his tavern, but he cannot own a machine since he has no operator's license.

It is the city's refusal to issue the necessary license that irks him and results in this litigation, seeking to restrain the city's enforcement of its licensing ordinance (No. 87384) and to compel the issuance of a license to him. The city alleges, in its answer, that he is not eligible to secure such a license. Both parties moved for a summary judgment; the city's motion was granted, and the action was dismissed. Mr. Ragan has appealed.

The underlying thesis of appellant's argument is that the power to reasonably regulate is conceded, but that the issue is the reasonableness of the ordinance as a regulatory measure. If it is not reasonable, it is not constitutional[2].

---

[1]The appellant begins his brief with the statement, "This is an action seeking a declaratory judgment that an Ordinance of the City of Seattle is unconstitutional under both the federal and State of Washington constitutions."

For the gist of the constitutional argument see note 2. Nowhere are we advised by article and section of the provisions of the constitutions relied on, except on page 24 of the brief where there is a reference to the Fourteenth Amendment to the Constitution of the United States and to a provision in the Constitution of the State of Washington identifiable as Art. I, § 12.

[2]The gist of the constitutional argument is found in quotations from

Appellant points out the distinction between a business which can be prohibited and one which can only be regulated in these quotations from his brief.

" . . . if the business is judged to be one not subject to prohibition entirely, then limitation of it such as is attempted here is spurious and must be eliminated. To ask the question is perhaps to answer it—What is there so inherently corrupting and fraught with public peril about juke boxes that would justify a city in banning them completely? Juke boxes are, after all, not akin to saloons, boxing matches or cockfights, which in the interest of public morality may be legitimately prohibited. Essentially, a juke box is a mechanical contrivance for dispensing a commodity, just as a gum machine dispenses a commodity. And certainly, no one will maintain that music, in itself, however unesthetic, so corrupts as to justify its elimination. It will be granted that the municipality has a legitimate interest in regulating the volume of the music to prevent the occurrence of a nuisance and to forbid the playing of obscene selections, but this is the basis on which regulation as distinguished from prohibition is justified. . . .

"Prohibition being unsupportable, it follows that arbitrary limitation of the extent of juke boxes must likewise fail. Ownership of juke boxes, subject to reasonable regulation as to volume and decency, must be open to all."

---

McQuillin on Municipal Corporations (3d ed.) on pages 8 and 9 of appellant's brief:

" 'There is, of course, a definite relationship between reasonableness and constitutionality of an ordinance, and its unreasonableness may be considered as a test of its unconstitutionality.' McQuillin, *Municipal Corporations*, Vol. 5, § 18.01, p. 182.

" 'Stated in broad outline in its simplest form, the problem of the constitutionality of ordinances in respect of common or fundamental rights is to reconcile the liberty of the individual with the public welfare. This is merely to state in one form the fundamental problem of constitutional protection of persons against municipal corporations. It is also, of course, merely one phase of the broader problem of constitutional protection of citizens against state action. On any level, public authority seeks to accord to the individual the widest liberty in personal action and in the use of his property, consistent with the interests of the public. Regulations restraining a common right are allowable on the grounds of public necessity only, not on the basis of mere desire, expediency or convenience; hence, the necessity must distinctly appear, and, moreover, the ordinance or regulation must be reasonable, uniform and enacted in good faith in the public interest.' McQuillin, *Municipal Corporations*, Vol. 5, § 19.10, p. 487."

■ Unfortunately, for appellant's position, we seem to have gone down what he seems to regard as the road to serfdom much further than he recognizes, and the "unsupportable" prohibition is accepted and supported by respectable judicial authority. In *Raymond v. Village of River Forest* (1953), 350 Ill. App. 80, 111 N. E. (2d) 848, the court held that an ordinance prohibiting the use of any coin-operated juke or music boxes was a valid exercise of the municipal police power. Much earlier it had been held that an ordinance prohibiting the playing of musical instruments, including juke boxes or other mechanical musical devices, in places where intoxicating liquor was offered for sale might be prohibited. *Zinn v. City of Steelville* (1943), 351 Mo. 413, 173 S. W. (2d) 398. See also *City of DeRidder v. Mangano* (1936), 186 La. 129, 171 So. 826.

Attention is also directed to the arguments of the intervenor, Washington Music Merchants, Inc. It says in its brief:

"The ownership and operation of juke boxes is such an activity [*i.e.*, one that has a potentially detrimental influence on the public welfare]. It is a matter of common knowledge, of which the court may properly take judicial notice, that music, whether it is Ravel's Bolero, Erotica, rock-and-roll, Sinatra, or Presley, may have a stimulating, exciting, frenetic effect on its listeners which tends to break down normal inhibitions and to produce disturbances, disorders, and conduct contrary to the accepted mores of the community.
"The point is underlined when the music is played in places of public resort where intoxicants are served, as is the case with the appellant here."

Disregarding the implication of judicial notice, this is a most refreshing recognition, from those most interested in the leasing of juke boxes, of the need for strict regulation wherever located and perhaps their prohibition where intoxicants are served.

An affidavit by the then chief of the detective division of the Seattle Police Department, submitted by the city, indicates that coercive tactics, involving threats of physical violence and interference with business, have been used

by certain of the parties engaged in the leasing of machines. These are certainly conditions to be considered in determining the extent and the character of requisite regulations.

Consequently, we approach the consideration of the reasonableness of ordinance No. 87384 with the assumption that juke boxes may not only be regulated but prohibited in the public interest.

▇▇▇▇ It is to be noted that the scope of our inquiry is limited to: Do the regulations have a reasonable and substantial relation to the accomplishment of some purpose fairly within the legitimate range or scope of the police power and not violate any direct or positive mandate of the constitution? *Nebbia v. New York* (1933), 291 U. S. 502, 78 L. Ed. 940, 54 S. Ct. 505, 89 A. L. R. 1469; *State v. Canyon Lbr. Corp.* (1955), 46 Wn. (2d) 701, 284 P. (2d) 316; *State v. Dexter* (1949), 32 Wn. (2d) 551, 202 P. (2d) 906; 13 A. L. R. (2d) 1081; *Campbell v. State* (1942), 12 Wn. (2d) 459, 122 P. (2d) 458; *Shea v. Olson* (1936), 185 Wash. 143, 53 P. (2d) 615, 111 A. L. R. 998; *Seattle v. Proctor* (1935) 183 Wash. 293, 48 P. (2d) 238; 13 A. L. R. (2d) 1081. Is the question presented to the court by someone who has been, or can be, injuriously affected by the regulation? *Galvin v. State Tax Comm.* (1960), 56 Wn. (2d) 738, 355 P. (2d) 362; *Port of Tacoma v. Taxpayers of the Port of Tacoma* (1959), 53 Wn. (2d) 734, 336 P. (2d) 872; *State v. Canyon Lbr. Corp., supra*; *State ex rel. Campbell v. Case* (1935), 182 Wash. 334, 47 P. (2d) 24; *Ajax. v. Gregory* (1934), 177 Wash. 465, 32 P. (2d) 560.

A specific illustration of the latter issue is Mr. Ragan's complaint that under ordinance No. 87384 he would have to pay two hundred and fifty dollars annually for an operator's license to own the machine used in his tavern, but others in identical positions (if they had been licensed operators in 1957 and succeeding years) would only have to pay ten dollars[3] annually for such a license. There would seem to

---

[3]This is regarded as a violation of Art. I, § 12, of the state constitution. "No law shall be passed granting to any citizen, class of citizens, or corporation, other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

be possible merit to this complaint; but unless he is entitled to procure such a license, the amount of the fee is of academic interest only, and he has no cause for complaint. Hence, unless Mr. Ragan is entitled to have a license, we will not consider whether there is any justification for such a difference in license fees.

The particular provisions of the ordinance, here under attack, will be stated in narrative form, together with Mr. Ragan's objections thereto and the city's answer.

By the terms of the ordinance whether a person owns one juke box used in his own restaurant or tavern, or whether he owns a hundred and fifty[4] which he rents out to others, he need have only one Mechanical-Music-Machine operator's license. Each machine must have a Mechanical-Music-Machine sublicense attached to it. In this manner the city knows who the operators are, how many machines each operator owns[5], and where they are located.

The number of licenses is limited by a provision that only one operator's license shall be issued for ten thousand residents of the city of Seattle, as shown by the last preceding state or Federal census[6]. There were, at the time the ordinance was passed in 1956, eighty-six licenses outstanding (reduced by October, 1959, to sixty-nine), so that if the 1960[7] census figures are used, there would be no new li-

---

[4]Before ordinance No. 87384, there was no limit to the number of machines one could own if he possessed an operator's license. The limit now is one hundred and fifty; however, no licensee had over a hundred at the time this case was decided.

[5]Sixty-nine license holders in October, 1959, owned nine hundred and thirty-nine machines; forty-one had but one machine each; ten had from forty-five to ninety-seven machines; the total being six hundred and fifty-two; the other eighteen license holders had from two to thirty-five machines; the total being two hundred and forty-six. By June, 1960, the number of single-machine owners had dropped to thirty-four; the multiple-machine operators were twenty-seven in number.

[6]By the 1950 Federal census (the most recent at the time the action was commenced and judgment entered), Seattle's population was 467,591. It was conceded that a state census, as of April 1, 1959, showed a population in Seattle of approximately 580,000.

[7]1960 Federal census for Seattle: 557,087.

censes available unless fourteen of the licenses outstanding in October, 1959, were not renewed.

It is urged, by Mr. Ragan, that this freezes the licenses in the hands of those presently holding them, giving them a monopoly[8] in the matter of installation of juke boxes; but, at the same time, places no effective limitation on the number of juke boxes in the city as each operator could have up to one hundred and fifty machines, or a total of ten thousand three hundred and fifty machines, based on sixty-nine licenses; and that the privileged few, thus accorded a monopoly, may include the very ones whose coercive tactics were referred to in the affidavit of which mention has been made.

It is further urged that there are no standards by which to determine when a license shall be issued or to whom, and it is said:

" . . . the conclusion becomes inescapable that the ordinance limits licenses, not in the interest of reasonable regulation of the industry, but in the interest of the privileged few already in the business."

Mr. Ragan further insists that the ordinance is not reasonable in that it makes no distinction between those who own and use their own machines in their own individual businesses and the "true" operators who are in the business of leasing machines to others.

The city's position is that the ordinance (No. 87384) amends certain sections of the basic license code (ordinance No. 48022), which ordinance, as amended, represents a proper exercise of the police power to achieve its purpose of preserving the peace by preventing rackteering and restricting coercion by competing professional operators and by requiring the approval of all location transfers of any juke box by the city council of Seattle; and, further, it prohibits the acquisition of any financial interest in juke-box locations by professional operators or manufacturers. It prevents monopoly by limiting any op-

[8]Considered as a possible violation of Art. XII, § 22, prohibiting monopolies.

erator to one hundred and fifty machines, thus preventing there ever being a large juke-box organization in the city. At the same time, it avoids a divestment of any persons of existing property interests.

The city takes the further position that when ordinance No. 87384 was adopted the number of juke boxes (then over one thousand) made policing—solely by tracing and attempting to prosecute each violation — a fruitless and economically impossible method; and the legislative authority chose the more positive means of limiting the number of licensees; and that while, theoretically, that limitation of licensees did not necessarily decrease the number of juke boxes in use, in practice it has done so—the number in operation having decreased to nine hundred and thirty-nine in October, 1959.

We are impressed with Mr. Ragan's arguments: That since many other tavern operators are permitted to own their own juke boxes, he should be accorded a like opportunity; that such individual ownership is the best way to eliminate any racketeering or coercive methods between the competing operators; and that, if the limitation of the number of juke boxes is the goal, the way to achieve it is to limit the number of juke boxes rather than the number of licensees.

However, we are not the duly elected members of the Seattle City Council, charged with the responsibility of enacting the legislation whereby the city limits and controls the operation of juke boxes within its limits. Whether the terms of an ordinance are wise or unwise is a question addressed solely to the city council. *State ex rel. Hardy v. Superior Court* (1930), 155 Wash. 244, 250, 284 Pac. 93.

We cannot say that the legislation enacted by the city, regulating the operation of juke boxes is unreasonable or oppressive, or that it does not have a substantial relation to the accomplishment of purposes fairly within the scope of the police power. As said by the Supreme Court of the United States in *Ohio ex rel. Clarke v. Deckebach* (1927), 274 U. S. 392, 71 L. Ed 1115, 47 S. Ct. 630:

"It is enough for present purposes that the ordinance, in

the light of facts admitted or generally assumed, does not preclude the possibility of a rational basis for the legislative judgment and that we have no such knowledge of local conditions as would enable us to say that it is clearly wrong."

Since Mr. Ragan is not presently eligible for a license, we will not, for reasons heretofore assigned, consider whether the license fee of two hundred and fifty dollars, which he would have to pay if he could so qualify, is unreasonably discriminatory.

The granting of a summary judgment of dismissal is affirmed.

ROSELLINI, OTT, and HUNTER, JJ., concur.

FINLEY, C. J., and DONWORTH, J., concur in the result.

MALLERY, J. (dissenting)—Arbitrary police power is the earmark of the police state, while the free world is characterized by the restraints upon sovereignty, which constitute the liberties of the people.

Thus, of the amendments comprising the Bill of Rights, the first two circumscribe the policies which may be made the subject of the police power, and the fourth, fifth, sixth, seventh, and eighth amendments impose restrictions upon the methods of its enforcement.

Of all of the powers of government, the police power is the most responsive to constitutional requirements, and the assumption that it is not is, to me, inexplicable.

We are here concerned with Art. I, § 12, of the Washington state constitution, which provides, *inter alia*:

"No law shall be passed granting to any citizen . . . privileges . . . which upon the same terms shall not equally belong to all citizens, . . ."

It is true that this relates to civil rather than criminal rights, but to law-abiding citizens it more nearly represents the spirit of America than any other. Equality before the law, and the land of opportunity are empty phrases if powerful influences can legally make fish of one and fowl of another, or if the right to live and make a living

is subject to arbitrary licensing. There is no room for a caste of Hindu untouchables in America.

Licensing is a police-power technique having as its sole justification the protecting of the public in some operation which is a matter of public concern. Licensing legislation is more often than not sought by an organized group of the particular persons to be licensed. Such measures, therefore, must be scrutinized to insure that licenses are available to all eligible persons upon terms of equality to the end that public protection, rather than special privilege, shall be implemented thereby.

The arguments marshalled in support of the ordinance are specious. It is not denied that it arbitrarily grants licenses as a special privilege to some persons upon terms which it will not grant them to others. This is precisely what the constitutional prohibition was intended to prevent.

I dissent.

WEAVER, J. (dissenting)—I dissent upon the ground that the ordinance arbitrarily grants licenses as a special privilege to some persons upon terms that it does not grant them to others.

FOSTER, J., concurs with WEAVER, J.

---

November 28, 1961. Petition for rehearing denied.