[No. 39770. En Banc. March 26, 1968.]

MARKHAM ADVERTISING COMPANY, INC., *et al., Appellants,*
v. THE STATE OF WASHINGTON *et al., Respondents.**

*Reported in 439 P.2d 248.

406

*Schweppe, Doolittle, Krug & Tausend, Thomas R. Beierle, Alfred J. Schweppe,* and *C. Lee Coulter,* for appellants.

*The Attorney General, Delbert W. Johnson, Charles E. Watts, Assistants,* and *Roger A. Gerdes, Special Assistant,* for respondents.

*Roberts, Shefelman, Lawrence, Gay & Moch, Harold S. Shefelman, George M. Mack, Timothy R. Clifford,* amici curiae.

HUNTER, J.—The question presented by this appeal from the dismissal of plaintiffs' action for a declaratory judgment is the constitutionality of the Highway Advertising Control Act of 1961 (hereafter referred to as the Act), and certain regulations adopted thereunder (hereafter referred to as the Regulations).

The original plaintiffs (appellants) were 10 outdoor advertising companies comprising virtually the entire outdoor advertising industry in this state. Three individuals later intervened, one a sign owner and the other two representing the class of landowner-lessors.

A number of groups interested in highway beautification submitted a brief amici curiae supporting the state and the members of the Highway Commission (respondents), who

we will hereafter refer to as the defendant or state. Labor organizations representing employees of outdoor advertising firms and Western Outdoor Markets, a California corporation, appeared as amici curiae on behalf of the plaintiffs.

The original complaint alleged that the Highway Advertising Control Act of 1961, RCW 47.42 (Laws of 1961, ch. 96, p. 1575, as amended by Laws of 1963, Ex. Ses., ch. 3, p. 1287) and the Regulations adopted thereunder by the Highway Commission on May 18, 1961, 3 Washington Administrative Code, ch. 252-40, were unconstitutional. Plaintiffs filed their suit praying for a declaratory judgment and a temporary injunction on February 26, 1964. The injunction was granted on March 9, 1964, and up to the time of the filing of this appeal, the Commission has been prevented from enforcing orders, issued under the Act, requiring the removal of certain advertising signs.

The setting for the issues presented in this case includes two federal statutes in addition to the state legislation and administrative Regulations mentioned above, all of which we will discuss in some detail in order to provide a better understanding of the disposition of this appeal.

In its federal interstate highway program, Congress made provision for control of outdoor advertising. In 1958, Pub. L. No. 85-767, ch. 1, § 131, 72 Stat. 904 (Aug. 27, 1958), formerly 23 U.S.C. § 131, entitled "Areas adjacent to the Interstate System," (now superseded by Pub. L. No. 89-285, 79 Stat. 1028 (Oct. 22, 1965)), became law. Congress expressed the purpose of this provision as follows:

> To promote the safety, convenience, and enjoyment of public travel and the free flow of interstate commerce and to protect the public investment in the National System of Interstate and Defense Highways, it is declared to be in the public interest to encourage and assist the States to control the use of and to improve areas adjacent to the Interstate System by controlling the erection and maintenance of outdoor advertising signs, displays, and devices adjacent to that system. § 131 (a).

It was declared a "national policy" that the erection and maintenance of advertising signs, displays and devices within 660 feet of the right-of-way of interstate system

highways should be "regulated, consistent with national standards to be prepared and promulgated by the Secretary [of Commerce]." Four types of signs were to be permitted within the regulated area, corresponding to the types authorized for "protected areas" under RCW 47.42.040, *infra.* All other signs were prohibited in the 660-foot belt lining the right-of-way. In order to implement the section the Secretary of Commerce was empowered to negotiate agreements with the states concerning

> provisions for regulation and control of the erection and maintenance of advertising signs, displays, and other advertising devices in conformity with the standards established in accordance with subsection (a) of this section and [these agreements] may include . . . provisions for preservation of natural beauty, prevention of erosion, landscaping, reforestation, development of viewpoints . . . , and the erection of markers, signs, or placques, and development of areas in appreciation of sites of historical significance. § 131(b).

Excepted from these agreements, and from the application of the section, were areas along the interstate system that were zoned for industrial or commercial uses under state law. As an inducement for entering into agreements with the Secretary of Commerce, the states were to receive an increase of $\frac{1}{2}$ of 1 per cent of the federal share payable on interstate projects.

In 1961, the state legislature enacted the Highway Advertising Control Act, RCW 47.42, the opening section of which declared:

> The control of signs in areas adjacent to state highways of this state is hereby declared to be necessary to promote the public health, safety, welfare, convenience and enjoyment of public travel, to protect the public investment in the interstate system and other state highways, and to attract visitors to this state by conserving the natural beauty of areas adjacent to the interstate system, and of scenic areas adjacent to state highways upon which they travel in great numbers, and to insure that information in the specific interest of the traveling public is presented safely and effectively. RCW 47.42.010.

The Act designates "protected areas" and "scenic areas" within which "no person shall erect or maintain a sign," except as expressly permitted under the Act. A "protected area" is the strip within 660 feet of the edge of the right-of-way of interstate system highways. A "scenic area" includes land within 660 feet of a state highway within a public park, federal forest area, public beach, public recreation area, national monument and "any state highway or portion thereof," outside the boundaries of an incorporated city or town, which the legislature may designate. In "protected areas," the four types of signs permitted are:

(1) Directional or other official signs or notices that are required or authorized by law;

(2) Signs advertising the sale or lease of the property upon which they are located;

(3) Signs, not inconsistent with the policy of this chapter and the national policy set forth in section 131 of title 23, United States Code and the national standards promulgated thereunder by the secretary of commerce, advertising activities being conducted at a location within twelve miles of the point at which such signs are located.

(4) Signs, not inconsistent with the policy of this chapter and the national policy set forth in section 131 of title 23, United States Code and the regulations promulgated thereunder by the secretary of commerce, designed to give information in the specific interest of the traveling public. RCW 47.42.040.

In "scenic areas," the Act allows only signs of types 1, 2 and those of type 3 which advertise activities conducted on the premises. RCW 47.42.060 authorizes the State Highway Commission to prescribe Regulations under the Act.

The Act also provides that any "sign erected or maintained contrary to the provisions of this chapter or regulations promulgated hereunder shall be a public nuisance," and that the permittee or owner of the property on which the sign is located shall be notified that the sign "must comply with the chapter or be removed." RCW 47.42.080. Signs which are not removed within 15 days of the entry of a removal order may be destroyed. The Act declares it unlawful to maintain, after March 11, 1964, any signs

erected prior to March 11, 1961 which do not comply with the Act or the Regulations. RCW 47.42.100. Where such signs are located in areas zoned for industrial and commercial uses, the grace period extends to March 11, 1965.

Except for signs of types 1, 2 and those of type 3 which advertise activities conducted on the premises where the sign is located, no sign may be erected or maintained without a permit issued by the Highway Commission. The Act sets forth the procedures for applying for and renewing permits, as well as for revocation of permits. Finally, the Act authorizes the Highway Commission to enter into agreements with the Secretary of Commerce, as provided for in Pub. L. No. 85-767, ch. 1, § 131, *supra*.

The Highway Commission, acting under authority granted it by the Act, issued Regulations on May 18, 1961. 3 WAC, ch. 252-40, *supra*. These Regulations, which are also challenged on this appeal, govern the size and spacing of permitted signs, prohibit signs which are unsightly or dangerous in construction, and limit each property owner to one for sale or lease sign and one sign advertising activities being conducted on the premises. Where a sign advertising activities conducted on the premises bears a trade name, this name may not be more conspicuous than the name of the local activity. The Regulations set forth the procedure for issuing sign permits, and provide that the Highway Commission may revoke permits for violations of the Act or Regulations.

The plaintiffs amended their complaint on January 20, 1966, to raise the issue of whether 23 U.S.C. § 131 (Supp. II, 1967) controls over inconsistent provisions of the state Act. The 1965 federal Highway Beautification Act replaced the former 23 U.S.C. § 131, and retitled the section, "Control of Outdoor Advertising." We will briefly describe its essential provisions.

The purpose of the present § 131 is stated as follows:

(a) The Congress hereby finds and declares that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System and the primary system should be controlled in

order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty.

In order to secure state compliance, the 1965 federal Act provides that federal-aid highway funds apportioned on or after January 1, 1968:

> to any State which the Secretary determines has not made provision for *effective control* of the erection and maintenance along the Interstate System and the primary system of outdoor advertising signs, displays, and devices . . . shall be reduced by amounts equal to 10 per centum of the amounts which would otherwise be apportioned to such State . . . until such time as such State shall provide for such effective control. § 131 (b). (Italics ours.)

"Effective control" is defined to mean that advertising signs, displays, and devices within 660 feet of the edge of the right-of-way of the interstate and primary systems shall be limited to:

> (1) directional and other official signs and notices, which signs and notices shall include, but not be limited to, signs and notices pertaining to natural wonders, scenic and historical attractions, which are required or authorized by law, which shall conform to national standards hereby authorized to be promulgated by the Secretary hereunder, which standards shall contain provisions concerning the lighting, size, number, and spacing of signs, and such other requirements as may be appropriate to implement this section, (2) signs, displays, and devices advertising the sale or lease of property upon which they are located, and (3) signs, displays, and devices advertising activities conducted on the property on which they are located. § 131 (c).

However, outdoor advertising which is located within commercial or industrial areas zoned under state law, or unzoned and specified in an agreement between the state and the Secretary, shall be permitted "while remaining consistent with the purposes of this section . . . ." § 131 (d).

Subsection (e) of the 1965 federal statute establishes a 5-year grace period for compliance. The statute also provides, in subsection (g):

Just compensation shall be paid upon the removal of the following outdoor advertising signs, displays, and devices—

(1) those lawfully in existence on the date of enactment of this subsection,

(2) those lawfully on any highway made a part of the interstate or primary system on or after the date of enactment of this subsection and before January 1, 1968, and

(3) those lawfully erected on or after January 1, 1968.

The federal government will pay a 75 per cent share of any such compensation. In the case of states which have entered into an agreement with the Secretary of Commerce pursuant to the former federal statute of 1958, the federal bonus of ½ of 1 per cent is still payable, so long as "the State maintains the control required under such agreement or the control required by this section, whichever control is stricter."

An additional provision of the Highway Beautification Act of 1965, Pub. L. No. 89-285, § 401, 79 Stat. 1028, declares:

Nothing in this Act or the amendments made by this Act shall be construed to authorize private property to be taken or the reasonable and existing use restricted by such taking without just compensation as provided in this Act.

The principal differences between the 1958 and 1965 federal statutes, for the purposes of this opinion, are two. The 1965 law, instead of conditioning a bonus upon the recipient state's signing an agreement with the Secretary of Commerce, imposes a penalty in terms of a reduction of federal aid if the state fails to make "provision for effective control" of outdoor advertising. Secondly, the 1965 statute provides for payment of "just compensation" for the removal of advertising signs, displays and devices, and allots a 75 per cent share of the cost involved to the federal government.

The trial of this case occupied 15 days, during which time 26 witnesses testified and 122 exhibits were introduced. The statement of facts before us exceeds 1,900 pages. The par-

ties agreed to a stipulation of facts which we summarize as follows.

The plaintiffs, except the intervenors, are firms engaged in the business of outdoor display advertising in this state. Their "plants" include outdoor advertising signs and structures which they own and maintain. Generally, the land on which these plants are located is leased, not owned. The lease terms vary, but typically are for from 1 to 10 years. The plaintiff firms own or operate approximately 7,631 advertising structures within this state. At least 470 of these are affected by the Highway Advertising Control Act of 1961.

Between 1½ and 10 per cent of the plaintiffs' sign structures are relocated annually, and depreciation is scheduled over periods varying from 7 to 12½ years. The standard size for poster panels is 300 square feet, but the panels on some of the affected advertising structures are as large as 600 square feet.

All of the advertising structures involved in this suit were lawfully erected prior to the 1961 state Act. Some are located in rural areas; some in suburban areas outside the boundaries of incorporated cities and towns; some within the corporate limits of cities and towns; and others within areas where the land is zoned for commercial or industrial use. As a rule, the structures are located along high-volume highways in positions deemed best able to attract motorists' attention. None of the plaintiffs' signs along interstate or scenic routes advertise activities conducted on the premises upon which they are located.

The structures affected by the 1961 state Act are only a portion of each advertising company plaintiff's plant, and are primarily employed for the advertising of nationally distributed products by nationally operating firms. The structures are also used to some extent by local businesses to advertise local products. The plaintiffs' signs occasionally display noncommercial messages dealing with political, religious, community and philanthropic matters, and may be hired by the public for such purposes at all times.

The Highway Commission has ordered the plaintiffs to remove those advertising structures which do not comply with RCW 47.42. When and if the courts will permit, the Commission intends to enforce its orders without paying compensation to the persons affected. In that event, the plaintiffs anticipate monetary losses aggregating not less than $150,000.

Of the facts which generated this voluminous record, those in contest relate mainly to whether or not outdoor advertising has an adverse effect upon highway safety. The plaintiffs called Dr. Ernest Blanche, a specialist in mathematics and statistical analysis, who testified that in his opinion there was no significant relationship between accidents and the presence of advertising structures along the highways. They also presented Dr. Reuel A. Sherman, a vision specialist, who testified that billboards heighten driver alertness and thus contribute to, rather than detract from, traffic safety. In rebuttal, the state presented Dr. Zygmunt Birnbaum, Professor of Mathematics and Director of the Laboratory of Statistical Research at the University of Washington, who critically examined the methods and data of Dr. Blanche and concluded that their probative value was questionable. Dr. Harold R. Blackwell, Professor of Biophysics, Physiological Optics, and Ophthalmology, and Director of the Institute for Research and Vision at Ohio State University testified for the defense concerning the amount of time a motorist requires to read a billboard—the driver's inattention interval. An experiment he had conducted indicated that this interval may be as long as 8 seconds. Dr. Blackwell explained that the driver's focusing his attention off the highway severely reduces his ability to detect and react to highway hazards. He described how a driver's nighttime vision is temporarily impaired when the driver shifts his eyes from the highway to a lighted signboard. Defendant also called Mr. William R. Curry, Assistant Traffic Engineer of the State Highway Department, who testified that an automobile moving at freeway speeds would travel between 470 and 800 feet during the time interval in which a motorist's eyes were diverted from the

road by a billboard. His opinion was that driver inattention at high speeds and on heavily traveled highways is particularly dangerous. He testified that drivers must be very attentive to road conditions at intersections and interchanges and that billboards tend to be located in such areas. He concluded that outdoor advertising signs are a definite traffic safety hazard. The state also produced evidence that, despite repeated warnings from the Highway Department, outdoor advertising signs were serviced and maintained in such a way as to violate the access limitations on freeways.

The case was tried by the court, sitting without a jury, and judgment was given for the state. The court entered extensive findings of fact which we condense as follows.

1. The defendant introduced sufficient evidence to permit reasonable men to find that a reasonable relationship exists between outdoor advertising and traffic safety. The evidence indicates that (a) outdoor advertising structures along the highways are intended to, and do, cause inattention to the driving task which, in turn, results in increased stopping distances and driver reaction times. Such factors contribute to traffic accidents; (b) plaintiffs' advertising structures are sometimes serviced from highway shoulders and rights-of-way, in violation of highway access limitations imposed to promote traffic safety; (c) advertising signs compete with official highway signs for driver attention, and decrease the effectiveness of cautionary and directional messages essential for the safety of the traveling public; (d) highway billboards, which cause driver inattention, are contrary to the principles of modern interstate highway design, since highways are being built to permit higher speeds and increased traffic loads, thus placing greater demands on motorists' attention and alertness; (e) intersections on interstate highways are particularly dangerous areas due to the frequency and nature of traffic movements. Also, official signs in such areas, directing safe travel of motorists, are more numerous, than in other locations along the highways. Driver inattention in intersection areas is more seriously dangerous than in other areas.

2. Signs located more than 660 feet from the highway are less obtrusive and are less likely to constitute a traffic safety hazard than signs located closer to the right-of-way.

3. Driving for pleasure is the most popular outdoor recreational activity in the nation and in this state, and modern highways are designed with this fact in mind.

4. Roadside advertising in scenic areas is detrimental to the appearance of these areas and is inconsistent with the purpose for which these areas were established.

5. A factual distinction exists between signs advertising activities conducted on the premises and signs advertising activities being conducted off-premises, because on-premises signs are a part of the on-premises business, while off-premises signs are a separate business, not otherwise related to activities conducted on the land.

6. A 12-mile distance is a reasonable limit within which to permit local and roadside businesses to use advertising signs.

7. In passing the Highway Beautification Act of 1965, *supra,* Congress did not intend to preempt the subject of highway advertising control. Rather, Congress intended to encourage the states to control highway advertising by making it financially advantageous for a state to do so.

The judgment which was entered on the court's findings of fact and conclusions of law determined that RCW 47.42 is constitutional under the constitutions of the United States and the state of Washington, and that the Regulations issued by the Highway Commission as 3 WAC, ch. 252-40, *supra,* are valid. The court further ordered that the temporary injunction issued at the commencement of suit be dissolved.

Nine of the advertising firm plaintiffs perfected this appeal from the judgment rendered. Eleven organizations concerned with highway beautification submitted an amici curiae brief on behalf of the defendant.

Plaintiffs first contend that Congress, by the 1965 federal statute, *supra,* intended to displace contrary or inconsistent provisions in the laws of this state, and in that respect has

preempted, under the supremacy clause of the federal constitution, this field of legislation. Their argument in support of this contention is based both on the conflicts between the federal statute and RCW 47.42, and on the allegedly mandatory language employed by Congress. The federal statute says, "just compensation shall be paid upon the removal of . . . outdoor advertising signs, displays, and devices" 23 U.S.C. § 131(g) (Supp. II, 1967); while the state law provides for regulating billboards under the police power, without requiring the payment of compensation for any losses caused. Plaintiffs maintain that the quoted language is mandatory, and claim that § 401, Pub. L. No. 89-285, *supra,* supports their conclusion. Further, the federal statute does not reach outdoor advertising in areas zoned industrial or commercial under state law, while RCW 47.42 makes no such exception. Again, the federal statute provides for a 5-year grace period before outdoor advertising signs must be removed but the state legislation allows a shorter time. There are other points of difference between the two statutes which we need not set forth specifically, since the issue is adequately presented by the above discussion.

In determining whether federal preemption is involved in this case, we turn to the guidelines set down in *Kelly v. Washington ex rel. Foss Co.,* 302 U.S. 1, 82 L. Ed. 3, 58 Sup. Ct. 87 (1937), where the court said at 9 and 10:

> Under our constitutional system, there necessarily remains to the States, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. *Minnesota Rate Cases,* 230 U.S. 352, 402. States are thus enabled to deal with local exigencies and to exert in the absence of conflict with federal legislation an essential protective power. And when Congress does exercise its paramount authority, it is obvious that Congress may determine how far its regulation shall go. There is no constitutional rule which compels Congress to occupy the whole field. Congress may circumscribe its regulation and occupy only a limited field. When it does so, state regulation outside that limited field and otherwise admissible is not forbidden or displaced. The princi-

ple is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so "direct and positive" that the two acts cannot "be reconciled or consistently stand together." (Citing cases.)

■ The basic question is simply, what did Congress intend? We must read Congressional intent from the language and effect of the statute here under consideration, 23 U.S.C. § 131 (Supp. II, 1967). Statutory intent cannot be ascertained from one sentence, or even one paragraph, read in isolation.

A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole. Horack, 2 Sutherland Statutory Construction 336, § 4703 (3d ed. (1943)).

The 1965 federal statute must be considered as a whole.

■ Our examination of § 131, *supra,* leads us to conclude that its essential operation is to condition payment of 10 per cent of a state's share of federal-aid highway funds upon the state's exercise of its powers to regulate outdoor advertising in a manner consistent with federal standards. We think that the purpose of the federal statute is obviously to induce the states to act, not to require them to do so. The statute allows the state to choose between foregoing 10 per cent of its allotment of federal-aid highway funds and compliance. If Congress had intended the provisions of 23 U.S.C. § 131 (Supp. II, 1967) to be mandatory on the states, there would have been no need to attach a monetary penalty to noncompliance. See *Southeastern Displays v. Ward,* 414 S.W.2d 573 (Ky. 1967). We hold that Congress has not invoked the supremacy clause by preempting the field of regulation covered by the state Act; that 23 U.S.C. § 131 (Supp. II, 1967) is directory, and does not interfere with the application of the Act as written.

■ The plaintiffs next contend that RCW 47.42 is an unconstitutional exercise of the police power. The rule is well established that a party attacking a statute has the

burden of showing why it is constitutionally defective. *Lenci v. Seattle,* 63 Wn.2d 664, 388 P.2d 926 (1964); *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960), *cert. den.* 364 U.S. 932, 5 L. Ed. 2d 365, 81 Sup. Ct. 379 (1961).

In *Lenci v. Seattle, supra,* we said at 667:

The burden of establishing the invalidity of an ordinance rests heavily upon the party challenging its constitutionality. *Letterman v. Tacoma,* 53 Wn. (2d) 294, 333 P. (2d) 650. Every presumption will be in favor of constitutionality. *Winkenwerder v. Yakima,* 52 Wn. (2d) 617, 328 P. (2d) 873. And, if a state of facts justifying the ordinance can reasonably be conceived to exist, such facts must be presumed to exist and the ordinance passed in conformity therewith. *Shea v. Olson,* 185 Wash. 143, 53 P. (2d) 615, 111 A.L.R. 998. These rules are more than mere rules of judicial convenience. They mark the line of demarcation between legislative and judicial functions.

In *Clark v. Dwyer, supra,* this court stated at 431:

It must be borne in mind that the state constitution is not a grant, but a restriction on the law-making power, and the power of the legislature to enact all reasonable laws is unrestrained except where, either expressly or by fair inference, it is prohibited by the state and federal constitutions. Where the validity of a statute is assailed, there is a presumption of the constitutionality of the legislative enactment, unless its repugnancy to the constitution clearly appears or is made to appear beyond a reasonable doubt. *Port of Tacoma v. Parosa,* 52 Wn. (2d) 181, 324 P. (2d) 438; *In re Bartz,* 47 Wn. (2d) 161, 287 P. (2d) 119; *Union High School Dist. No. 1 v. Taxpayers of Union High School Dist. No. 1,* 26 Wn. (2d) 1, 172 P. (2d) 591. Where possible, it will be presumed that the legislature has affirmatively determined any special facts requisite to the validity of the enactment, even though no legislative finding of fact appears in the statute. *State ex rel. Collier v. Yelle,* 9 Wn. (2d) 317, 333, 115 P. (2d) 373.

■ The plaintiffs assert that the Act constitutes an invalid exercise of the police power for the reason that it does not bear a reasonable and substantial relation to a proper legislative purpose. The test for this determination is stated in *Ragan v. Seattle,* 58 Wn.2d 779, 783, 364 P.2d 916 (1961), as follows:

Do the regulations have a reasonable and substantial relation to the accomplishment of some purpose fairly within the legitimate range or scope of the police power and not violate any direct or positive mandate of the constitution? *Nebbia v. New York* (1933), 291 U.S. 502, 78 L. Ed. 940, 54 S. Ct. 505, 89 A. L. R. 1469; *State v. Canyon Lbr. Corp.* (1955), 46 Wn. (2d) 701, 284 P. (2d) 316; *State v. Dexter* (1949), 32 Wn. (2d) 551, 202 P. (2d) 906; 13 A. L. R. (2d) 1081; *Campbell v. State* (1942), 12 Wn. (2d) 459, 122 P. (2d) 458; *Shea v. Olson* (1936), 185 Wash. 143, 53 P. (2d) 615, 111 A. L. R. 998; *Seattle v. Proctor* (1935) 183 Wash. 293, 48 P. (2d) 238; 13 A. L. R. (2d) 1081.

▇ The plaintiffs argue that the legislature could not reasonably have found that RCW 47.42 will promote traffic safety, that this is therefore not the real purpose of the Act, and that the other purposes of the Act are not within the scope of the police power. They claim to have overcome the presumption of validity with which legislative findings are clothed.

The evidence plaintiffs presented at the trial failed to convince the trial court. We are satisfied that the trial court's implicit finding, that there is a substantial relation between traffic safety and the regulation of outdoor advertising, is amply supported by the record; and we hold that a purpose of the Act is to promote traffic safety. This is clearly a proper purpose for the exercise of the police power.

▇ However, the plaintiffs maintain that the basic purpose of the Act is to promote aesthetic values, and that for that reason the Act is invalid. We have held that it is no objection to a police power law to say that one of its purposes is to promote aesthetic values. *Lenci v. Seattle, supra.* Moreover, this court does not accept the narrow view of the public welfare which plaintiffs urge upon us. We have many times emphasized the broad scope of the police power. In *Shea v. Olson,* 185 Wash. 143, 53 P.2d 615, 111 A.L.R. 998 (1936), we said at 153:

However difficult it may be to give a precise or satisfactory definition of "police power," there is no doubt that the state, in the exercise of such power, may prescribe laws tending to promote the health, peace, morals,

education, good order and welfare of the people. Police power is an attribute of sovereignty, an essential element of the power to govern, and a function that cannot be surrendered. It exists without express declaration, and the only limitation upon it is that it must reasonably tend to correct some evil or promote some interest of the state, and not violate any direct or positive mandate of the constitution.

The above language was recently quoted with approval in *Clark v. Dwyer, supra,* and substantially restated in *Treffry v. Taylor,* 67 Wn.2d 487, 408 P.2d 269 (1965). Mr. Justice Douglas, writing of the police power in *Berman v. Parker,* 348 U.S. 26, 32, 99 L. Ed. 27, 75 Sup. Ct. 98 (1954), characterized it as follows:

An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation,

. . . .

The legislature has declared that the Act is intended to promote the ". . . convenience and enjoyment of public travel," "to protect the public investment in . . . highways," ". . . to attract visitors to this state," and to conserve "the natural beauty of areas" adjacent to our highways. RCW 47.42.010. We have no doubt that purposes such as these are properly included within the scope of the "public welfare". Other courts have reached the same conclusion. The Massachusetts Supreme Judicial Court stated in *General Outdoor Advertising Co. v. Department of Public Works,* 289 Mass. 149, 185, 187, 193 N.E. 799 (1935):

The phrase "aesthetic considerations" in our opinion has commonly been applied to regulations as to the character, form and appearance of constructions to be erected. The rules and regulations here in question have different aims. They do not rest primarily upon aesthetic considerations in the sense in which that phrase has been used to

overturn legislative enactments. They are designed to promote safety of travel upon the highways, and enjoyment of resort to public parks and reservations, to shield travellers upon highways from the unwelcome obtrusion of business appeals, to protect property from depreciation, and to make the Commonwealth attractive to visitors from other States and countries as well as to her own citizens. The rules and regulations are so phrased as to permit the exclusion of billboards and other advertising devices from territory whose scenic beauty would be especially harmed by their presence. . . . Grandeur and beauty of scenery contribute highly important factors to the public welfare of a State. To preserve such landscape from defacement promotes the public welfare and is a public purpose. . . . It is, in our opinion, within the reasonable scope of the police power to preserve from destruction the scenic beauties bestowed on the Commonwealth by nature in conjunction with the promotion of safety of travel on the public ways and the protection of travellers from the intrusion of unwelcome advertising.

The New Hampshire Supreme Court stated in *Opinion of the Justices,* 103 N.H. 268, 270, 271, 169 A.2d 762 (1961):

It seems unnecessary to decide here whether aesthetic considerations alone furnish ground for the exercise of the police power as is increasingly stated by modern authorities . . . though denied under earlier decisions. . . . In any event, in this day and age we do not believe that such can be entirely ignored and without stating that they are decisive, we hold that the maintenance of the natural beauty of areas along interstate highways is to be taken into account in determining whether the police power is properly exercised. [Citations omitted.]

Bearing in mind all the factors involved, in our opinion the regulation of outdoor advertising along interstate highways is a valid exercise of the police power.

The Ohio Supreme Court in *Ghaster Properties, Inc. v. Preston,* 176 Ohio St. 425, 438, 200 N.E.2d 328 (1964), stated:

In considering whether a proposed statute prohibiting billboards adjacent to a highway bears a real and substantial relation to the public welfare, the General Assembly may properly give weight not only to its effect in promoting public safety but also to its effect in promot-

ing the comfort, convenience and peace of mind of those who use the highway, by removing annoying intrusions upon that use.

Also see *New York State Thruway Authority v. Ashley Motor Court, Inc.*, 10 N.Y.2d 151, 176 N.E.2d 566, 218 N.Y.S.2d 640 (1961).

We may take judicial notice of the fact that this state is richly endowed with scenic beauty and that one of the common purposes of travel along our highways is to enjoy that beauty. The public welfare embraces healthful recreation and the protection of our national resources. As the United States Supreme Court has said:

> The concept of the public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. *Berman v. Parker, supra,* at 33.

We hold that the purposes of the Act as expressed in RCW 47.42.010, *supra,* are within the legitimate scope of the police power.

■ The plaintiffs further argue that the Act bears no reasonable and substantial relation to the accomplishment of these purposes. The applicable test is stated in *Ragan v. Seattle, supra.* We agree with the trial court that, since the result intended in RCW 47.42 is to remove roadside structures which draw driver attention and obstruct the view of the landscape, prohibiting the "erection" and "maintenance" of such structures, under the conditions established by the provisions of the Act and the Regulations, is a means reasonably and substantially adapted to that end.

■ Plaintiffs also contend that the Act is an improper exercise of the police power because it is manifestly unreasonable and unnecessary. As we said in *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 178, 117 Pac. 1101 (1911):

> [T]he test of a police regulation, when measured by . . . [the due process] clause of the constitution, is

reasonableness, as contradistinguished from arbitrary or capricious action.

Our consideration of this contention again begins with the presumption that the Act is reasonable and necessary. *Lenci v. Seattle, supra; Clark v. Dwyer, supra.* We are required to decide, first, whether the Act is manifestly or palpably arbitrary or capricious, and second, whether plaintiffs have succeeded in refuting the presumption of reasonableness and necessity.

We find, considering the Act's purposes, language and effect, that it is reasonable and necessary and not arbitrary or capricious. We further hold, taking the Act as a whole considered with the record in this case, that the plaintiffs have not refuted the presumption of reasonableness attaching to legislative enactments under the police power.

The plaintiffs, however, assert that the legislature may not declare a "legitimate" business a nuisance under the police power, and that in any event such a declaration may not apply to an existing "legitimate" business. Neither of these objections has merit. It is within the police power to declare a previously unregulated business a nuisance in fact and law. *Reinman v. Little Rock,* 237 U.S. 171, 59 L. Ed. 900, 35 Sup. Ct. 511 (1914). See *Sittner v. Seattle,* 62 Wn.2d 834, 384 P.2d 859 (1963). The legislature may also apply such legislation to existing businesses. *Ghaster Properties, Inc. v. Preston, supra; Moore v. Ward,* 377 S.W.2d 881 (Ky. 1964).

Plaintiffs also claim that the Act is unreasonable because it does not afford a sufficiently long amortization period for their "vested property rights." The court in *Ghaster Properties, Inc. v. Preston, supra,* answered this argument by pointing to the distinction between the type of measure represented by RCW 47.42 and a zoning regulation:

> [T]he statutes involved in the instant case make the use of land for billboard purposes within 660 feet of an interstate highway unlawful and a nuisance. Unlike in the zoning cases, their continued use for such purposes will

not merely be a lawful use that does not conform with a zoning restriction but a use that is unlawful and a nuisance either in or out of any zoning district . . . . at 441.

This court has said that it is within the legislature's power to forbid a use altogether without making any provision for an amortization period. *State v. Thomasson,* 61 Wn.2d 425, 427, 378 P.2d 441 (1963); *State ex rel. Miller v. Cain,* 40 Wn.2d 216, 219, 242 P.2d 505 (1952). Under all the circumstances, we are satisfied that the amortization period provided in the Act is reasonable.

 The plaintiffs also maintain that *Seattle v. Ford,* 144 Wash. 107, 257 Pac. 243 (1927), requires us to apply a higher standard of "reasonableness" when the police power measure being tested is one which regulates a business, not harmful in itself, being conducted on private property. The case is not apposite to the facts of the instant case. We do not agree that outdoor advertising here is conducted completely on private premises. A billboard is located in such a manner as to command public attention. Even though it may be on private property the viewer is on a public way. Both elements, the sign and the viewer, are essential to the operation of the business. "[T]he use prohibited by these statutes is in substance and effect a use of the public highway for advertising purposes." *Ghaster Properties, Inc. v. Preston, supra,* at 442. The plaintiffs' business is clearly one which involves a substantial public interest, and one which the state, under the police power, may appropriately regulate.

Many other courts, considering like statutes, support our conclusion that the regulation of outdoor advertising is a reasonable and proper exercise of the police power; *Moore v. Ward, supra; Ghaster Properties, Inc. v. Preston, supra; Opinion of the Justices, supra; New York State Thruway Authority v. Ashley Motor Court, Inc., supra; General Outdoor Advertising Co. v. Department of Public Works, supra; Hav-a-Tampa Cigar Co. v. Johnson,* 149 Fla. 148, 5 So.2d 433 (1941). We know of only one court which has invalidated a statute of this type, and we find the opinion

singularly unpersuasive. *State Highway Dept. v. Branch,* 222 Ga. 770, 152 S.E.2d 372 (1966).

■ Plaintiffs further contend that the Act deprives them of due process of law because it authorizes the taking of their property without compensation. U.S. Const. amend. 14; Const. art. 1, § 3. When a court determines, as we have in this case, that the police power has been properly invoked, there is no basis for this contention. *Atlantic Coast Line R.R. v. Goldsboro,* 232 U.S. 548, 558, 58 L. Ed. 721, 34 Sup. Ct. 364 (1914); *New York State Thruway Authority v. Ashley Motor Court, supra,* at 644. The police power represents the assertion of the paramount rights of the community at large. "The possession and enjoyment of all rights are subject to this power." *State ex rel. Davis-Smith Co. v. Clausen, supra,* at 178. Plaintiffs' due process rights have been secured to them once it has been determined that the exercise of the police power is in harmony with constitutional requirements. It should be noted that our research discloses that 23 of the states which have enacted legislation comparable to RCW 47.42, have also made no provision for the payment of compensation under their statutes.

The plaintiffs contend that the Act is contrary to the equal protection clause of the fourteenth amendment to the federal constitution and the privileges and immunities clause of the state constitution, article 1, section 12. These provisions have the same import, and we apply them as one.

■ In the recent case of *Seattle v. See,* 67 Wn.2d 475, 486, 408 P.2d 262 (1965), we stated the following regarding the requirements for valid legislative classifications:

> The guarantee of equal protection of the laws and the prohibition of special privileges and immunities require that class legislation apply alike to all persons within a class, and reasonable ground must exist for making a distinction between those within and those without a specified class. *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960). "The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489, 99 L. Ed. 563, 75 Sup. Ct. 461 (1955).

. . . The United States Supreme Court has, on another occasion, stated, "Equal protection does not require identity of treatment." *Walters v. St. Louis,* 347 U.S. 231, 237, 98 L. Ed. 660, 74 Sup. Ct. 505 (1954). The very act of classification involves some degree of discrimination. Equal protection "only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary." *Walters, supra.* There is remaining a wide area of legislative discretion.

In *State v. Persinger,* 62 Wn.2d 362, 368, 369, 382 P.2d 497 (1963), we further stated:

When a statutory classification is challenged, if any state of facts reasonably can be conceived that will sustain it, there is a presumption that such facts exist. The burden is upon the one who assails the classification of showing that it fails to rest upon any reasonable basis and is essentially arbitrary.

Plaintiffs argue that the Act and the Regulations are invidiously arbitrary and discriminatory in many of the classifications that they establish. We have considered all of the objections raised, and we agree with the trial court that these classifications are reasonable. We can conceive of a state of facts which justifies every classification here attacked, and this requires us to uphold the Act and the Regulations. *State v. Persinger, supra.*

■ Plaintiffs further contend that the Act transgresses first amendment guarantees of freedom of speech. In *Valentine v. Chrestensen,* 316 U.S. 52, 86 L. Ed. 1262, 62 Sup. Ct. 920 (1942), the court said at 54:

We are . . . clear that the Constitution imposes no . . . restraint on government as respects purely commercial advertising.

The decision upheld the validity of a New York City ordinance regulating the distribution of handbills. In the instant case, the question is whether the public's right to enjoy the highways free of the dangerous, obtrusive, and unsolicited presence of advertising structures is outweighed

by the minimal free speech interest claimed by plaintiffs. As Mr. Justice Brandeis observed in *Packer Corp. v. Utah,* 285 U.S. 105, 110, 76 L. Ed. 643, 52 Sup. Ct. 273 (1932):

> "Billboards, street car signs, and placards and such are in a class by themselves. . . . Advertisements of this sort are constantly before the eyes of observers on the streets . . . to be seen without the exercise of choice or volition on their part. Other forms of advertising are ordinarily seen as a matter of choice on the part of the observer. . . . The radio can be turned off, but not so the billboard . . . ."

Speaking of outdoor advertising, the court in *General Outdoor Advertising Co. v. Department of Public Works, supra,* said at 168:

> [I]t is forcibly thrust upon the attention of all such persons [who travel on the highways], whether willing or averse. For such persons who strongly wish to avoid advertising intrusion, there is no escape; they cannot enjoy their natural and ordinary rights to proceed unmolested.

This intrusive quality of highway outdoor advertising, coupled with the hazard it poses to traffic safety and its purely commercial nature, all persuade us that RCW 47.42 is a reasonable regulation which does not violate the First Amendment. There is no blanket requirement that the legislature must subordinate all other legitimate public interests to the protection of free speech. As stated by the United States Supreme Court in *Kovacs v. Cooper,* 336 U.S. 77, 88, 93 L. Ed. 513, 69 Sup. Ct. 448 (1949):

> The preferred position of freedom of speech in a society that cherishes liberty for all does not require legislators to be insensible to claims by citizens to comfort and convenience. To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself.

■ Plaintiffs' final contention is that RCW 47.42 is an unlawful delegation of legislative powers under our state constitution, article 2, section 1, amendment 7. They argue that the Act does not provide adequate standards for the Highway Commission to follow in issuing regulations. A

legislative delegation is tested by the standards we set forth in *Miller v. Tacoma,* 61 Wn.2d 374, 378 P.2d 464 (1963), at 388, 389:

> The rule is succinctly stated in *Keeting v. Public Util. Dist. No. 1,* 49 Wn. (2d) 761, 767, 306 P. (2d) 762 (1957).
>
> "It is unconstitutional for the legislature to abdicate or transfer to others its legislative function. It is not unconstitutional for the legislature to delegate administrative power. In so doing, the legislature must define (a) what is to be done, (b) the instrumentality which is to accomplish it, and (c) the scope of the instrumentality's authority in so doing, by prescribing reasonable administrative standards."

■ In the case at hand the legislature has declared its purpose, at length, in RCW 47.42.010. Moreover, the instrumentality has been designated and its allowed scope of authority has been defined in RCW 47.42.060, where the Highway Commission is authorized to issue Regulations

> for the erection and maintenance of signs permitted by this chapter within protected areas and scenic areas, and other regulations for the administration of this chapter *consistent with the policy of this chapter* and the *national policy* set forth in section 131, title 23, United States Code and the *regulations promulgated thereunder* . . . . (Italics ours.)

We think that the administrative standards prescribed by the legislature under the Act are adequate and reasonable. We approved the practice of referring state administrative rules and regulations to federal requirements in *Yelle v. Bishop,* 55 Wn.2d 286, 347 P.2d 1081 (1959). Under the circumstances of this case, we find no improper delegation of legislative power.

The decision of the trial court is affirmed in all respects.

FINLEY, C. J., WEAVER, ROSELLINI, HAMILTON, HALE, and NEILL, JJ., concur.

FINLEY, C. J. (concurring)—I have signed and concur fully in the majority opinion. However, because of the very apparent disparity in the majority's and the dissent's description of the legal issues involved in this case, I feel it is

necessary and appropriate to make this short supplemental statement.

The dissent mounts a spirited, and somewhat caustic and stinging verbal attack on something. However, this leaves me a bit uncertain as to the reasons for the sortie and even more dubious as to its objective, *i.e.*, whether the legislature, the statute, or the majority opinion, is the target of the assault. In any event, I can say, or will concede that, it does seem to me the dissent is basically concerned about the legislative judgments made in the course of enactment of the statute involved in this appeal, said judgments having been made by one branch of our tripartite-structured state government, traditionally regarded as a constitutionally separate, independent and equal branch of state government.

It is my conviction that the legislative judgments made in the enactment of the statute are within the constitutional prerogatives of the legislative branch. Furthermore, I believe this is amply demonstrated or documented by the majority opinion. Finally, I feel some compulsion to say that it seems to me the legislative judgments consummated in the enactment of the statute merit, or even require, the exercise of judicial self-restraint of a very high order, rather than judicial remonstrance.

In other words, in terms of our appellate judicial function, let us render unto the legislators what is theirs, rightfully and constitutionally, in the matter of legislative judgments respecting the exercise of state police power under our state constitution. As Holmes, J., in a slightly different context, once remarked: "I think the proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain." *Tyson & Brother—United Theatre Ticket Offices, Inc. v. Banton,* 273 U.S. 418, 446 (1927) (Holmes, J., dissenting).

HILL, J. (dissenting)—I dissent. I see in the majority opinion only a very well written defense and justification of legislation which would never have been enacted if it had not been necessary to avoid a penalty in the terms of a reduction of federal aid for our highway program. The majority explains the situation clearly:

> The principal differences between the 1958 and 1965 federal statutes, for the purposes of this opinion, are two. The 1965 law, instead of conditioning a bonus upon the recipient state's signing an agreement with the Secretary of Commerce, imposes a penalty in terms of a reduction of federal aid if the state fails to make "provision for effective control" of outdoor advertising.

In short, we dance to the federal tune.

Our slips are showing only too plainly when we pontificate about getting rid of billboards within 660 feet of our interstate and defense highways to promote the public health, welfare, safety, convenience, and the enjoyment of public travel (not to mention the spiritual and aesthetic values referred to in the majority opinion), and then permit signs advertising activities being conducted within 12 miles of the point at which the signs are located. Does the fact that the activity being advertised is relatively close at hand make the sign less dangerous to the public health, safety, welfare, convenience, and the enjoyment of public travel (not to mention the effect upon spiritual and aesthetic values involved). Are we so devoid of all humanitarian and aesthetic instincts that we do not extend this beneficent protection of the public health, welfare, safety, convenience, and the enjoyment of public travel (not forgetting the aesthetic and spiritual values) to those citizens who have to drive on our other state highways and our county roads? Are the travelers on such roads second class citizens whose health, welfare, safety, convenience, enjoyment, and aesthetic senses are to be neglected?

Insofar as protection of our scenic beauties are concerned, we are certainly beginning on the wrong highways. These "interstate and defense highways" are not located with regard to scenic beauties, but to the shortest, fastest

feasible routes between centers of population. Our really scenic roads, such as Chuckanut Drive, are not protected by this legislation.

If there exists a public necessity for the removal of billboards from our highways, let us stop the pretense that we are operating under the police power, and condemn the right to erect billboards within a designated distance of our highways as we condemn access and other property rights.

Even the federal government manifests some concern for the property rights of an established and heretofore lawful business by offering to bear three-quarters of the cost of the payment of "just compensation" for the removal of existing signs; while we, motivated by the "federal bonus of $\frac{1}{2}$ of 1 per cent" and the desire to save one-quarter of the cost of that removal, decide that no compensation is necessary because these established signs are a menace to the health, welfare, safety, convenience, and enjoyment of the traveling public and are likewise an affront to their spiritual and aesthetic values.

July 19, 1968. Petition for rehearing denied.