STATE of Maine acting By and Through its DEPARTMENT OF TRANSPORTATION

v.

NATIONAL ADVERTISING COMPANY.

Supreme Judicial Court of Maine.

June 6, 1978.

Lester A. Olson (orally), Dept. of Transp., Augusta, for plaintiff.

Marden, Dubord, Bernier & Chandler by Albert L. Bernier (orally), Waterville, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, DELAHANTY, ARCHIBALD and GODFREY, JJ.

ARCHIBALD, Justice.

The State of Maine has appealed seasonably from a Superior Court judgment for the defendant following acceptance of a report of a Referee.

The State's action, as amended, sought to enjoin the defendant from conducting off-premise outdoor advertising along "Interstate highway Route 95 and all of the primary highway routes within the State of Maine in violation of R.S. Title 32, Chapter 38, Sections 2711 to 2723, inclusive, as amended and 23 U.S.C. Section 131 . . ."[1] By agreement this action was referred to a Referee, the parties reserving the right to object to the acceptance of the report. Rule 53, M.R.Civ.P.

We sustain the appeal.

I

■ Review of a referee's findings of fact is limited by the well accepted rule that such findings are conclusive unless clearly erroneous. Field, McKusick and Wroth, *Maine Civil Practice*, § 53.4 (2d ed. 1970). We have read the record carefully and agree with the Referee's findings of fact, which we now quote in all essential parts as follows:

The Federal Highway Beautification Act, 23 U.S.C., Sec. 131 was enacted by

---

1. 32 M.R.S.A. ch. 38, §§ 2711 to 2723, Outdoor Advertising, was repealed by P.L.1977, ch. 494, § 2, which by Section 1 thereof enacted ch. 21 of Title 23, Maine Traveler Information services.

Congress to control and limit the maintenance of advertising signs along the interstate and primary highway system. It became effective on October 22, 1965. It was designed to induce effective State action. Subsection (g) provided:

'Just compensation shall be paid upon the removal of the following outdoor advertising signs, displays and devices —(1) those lawfully in existence on the date of enactment of this sub-section, (2) those lawfully on any highway made a part of the interstate or primary system on or after the date of enactment of this subsection and before January 1, 1968, and (3) those lawfully erected on or after January 1, 1968.'

The Federal share of such compensation was fixed at 75%. This created a 'hiatus' period since no compensation was provided for signs erected between October 22, 1965 and January 1, 1968. As an inducement to State action in control of signs, a penalty of 10% of the Federal share of Federal aid highway cost was imposed on states failing to act.

In an effort to avoid any penalty, an agreement and a plan were evolved as between the Maine State Highway Commission (succeeded by the Department of Transportation) and the Federal Highway Administrator. Legislation was then presented to the Maine Legislature and enacted as 32 M.R.S.A., Secs. 2711 to 2723 inclusive comprising a new Chapter 38, 'An Act Relating to Outdoor Advertising.' For the purpose of treating the issue here, it is only necessary to direct attention to certain provisions of Section 2719. Subsection 4 provides for the payment of 'just compensation' upon acquisition of signs 'lawfully in existence on the effective date of this chapter' (October 1, 1969) and 'lawfully erected on or after the effective date of this chapter.' All of the signs in issue here fell into one of these two categories. Subsection 6 provided for the acquisition of non-conforming signs by eminent domain 'when and only when the federal share of just compensation prescribed in the Highway

Beautification Act of 1965 and the Federal-Aid Highway Act of 1968 is available to the State of Maine or the Maine Legislature makes a specific appropriation and such acquisition shall be in accordance with a priority to be established by the commission.' Subsection 7 provided for 'the use of the police power of the State' and for amortization of signs when Federal funds are not available or when the immediate removal of signs is not required but removal via regulation over an extended period of time, no longer than five years is 'satisfactory.'

Having discovered that Federal funds were available, the Department of Transportation took and paid full compensation for all signs erected before October 22, 1965. Because of the lack of Federal funds available for compensation, it was administratively determined within the Department that signs erected between October 22, 1965 and October 1, 1969 would be treated as amortization signs for which no compensation would be paid upon removal and that all such signs would be deemed to be fully amortized on October 1, 1974, that being the expiration of five years from the effective date of the Maine statute.

.

II

The Referee concluded that the primary issue raised by this litigation was whether the State could compel the removal of the defendant's nonconforming signs without the payment of compensation. In order to resolve this question, it is necessary to consider both federal and state law relative to the control of outdoor advertising.

II-A

As already pointed out in the Referee's findings, at the time this action was initiated the federal law (23 U.S.C. § 131(g)) dealing with compensation for the removal of outdoor advertising signs provided that no compensation need be paid upon the removal of signs erected between *October*

*22, 1965* and *January 1, 1968.*[2] Federal law seemed to mandate, however, that just compensation be paid upon the removal of all other signs. In order to clarify this point, the Secretary of Commerce sought an opinion from the U.S. Attorney General in 1966, who concluded "(a) that title I (23 U.S.C. § 131) must be read as requiring each state to afford just compensation upon removal of outdoor advertising signs as a condition of avoiding the ten per cent penalty (23 U.S.C. § 131(b)) . . . ." Cunningham, *Billboard Control Under the Highway Beautification Act of 1965,* 71 Mich.L.Rev. 1310 (1973). In other words, Congress did not create an absolute *federal* right to compensation if a state should elect to remove the signs via its police power and incur the ten per cent penalty.

In *Markham Advertising Company v. State,* 73 Wash.2d 405, 439 P.2d 248 (1968), several outdoor advertising companies challenged the constitutionality of Washington's Highway Advertising Control Act of 1961. The Washington statute provided for regulation under *the police power* without requiring the payment of compensation. The plaintiffs in *Markham* argued that the mandatory language of 23 U.S.C. § 131(g) required compensation and that Congress, under the Supremacy Clause of the federal constitution, had preempted this field of legislation. The Court in *Markham* rejected this argument, holding:

> We think that the purpose of the federal statute is obviously to induce the states to act, not to require them to do so. The statute allows the state to choose between foregoing 10 per cent of its allotment of federal-aid highway funds and compliance. If Congress had intended the provisions of 23 U.S.C. § 131 (Supp. II, 1967) to be mandatory on the states,

there would have been no need to attach a monetary penalty to noncompliance. 439 P.2d at 257.

Other courts have also held that state and/or municipal regulation of outdoor advertising has not been preempted by federal law. *Art Neon Co. v. City and County of Denver,* 488 F.2d 118 (10th Cir. 1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *Sullivan Outdoor Advertising v. Department of Transportation,* 420 F.Supp. 815 (N.D.Ill.1976); *Donnelly Advertising Corp. v. City of Baltimore,* 279 Md. 660, 370 A.2d 1127 (1977). In addition one study concludes that the congressional hearings in 1965 proceeded on the assumption that the requirements of Title I of the Highway Beautification Act were not mandatory on the states. This study reasoned that

> [t]here is nothing in the hearings to indicate that the subcommittee members intended to forbid absolutely the use of any state's police power to eliminate highway advertising signs, although it was clearly assumed that few, if any, states would be willing to suffer the ten per cent penalty in order to avoid payment of just compensation to sign owners and landowners.

Cunningham, *Billboard Control Under the Highway Beautification Act of 1965,* 71 Mich.L.Rev. 1317 (1973).

■ We therefore determine that the federal Highway Beautification Act, *at the time this action was initiated,* did not mandate the payment of compensation for the removal of nonconforming highway signs.[3]

## II–B

In 1967, pursuant to 23 U.S.C. § 131(d) which authorized the Secretary of Trans-

---

2. In 1975, 23 U.S.C. § 131(g) was amended to read as follows:

   (g) Just compensation shall be paid upon the removal of any outdoor advertising sign, display, or device lawfully erected under State law. The Federal share of such compensation shall be 75 per centum. Such compensation shall be paid for the following:
   (A) The taking from the owner of such sign, display, or device of all right, title,

leasehold, and interest in such sign, display, or device; and
   (B) The taking from the owner of the real property on which the sign, display, or device is located, of the right to erect and maintain such signs, displays, and devices thereon.

3. The legislative history relative to the amendment of 23 U.S.C. § 131(g) in 1975 (*see* n.2) indicates that this may no longer be true.

portation to enter into agreements with the several states to promote the orderly and effective display of outdoor advertising, Maine and the federal government entered into an agreement the purpose of which was "to promote the reasonable, orderly and effective display of outdoor advertising while remaining consistent with the National policy, to protect the public investment in the Interstate and Federal-aid primary systems, to promote the safety and recreational value of public travel and to preserve natural beauty." This agreement was to become binding on both parties after the agreement had been ratified by an act of the Maine State Legislature.

In 1969 the Legislature enacted "An Act Relating to Outdoor Advertising," P.L.1969, ch. 257, §§ 2719(6) and (7), providing as follows: [4]

6. Eminent domain; limitation. The commission may acquire by the power of eminent domain all right, title, leasehold or any interest in nonconforming signs, and the property right to maintain signs not in conformity with this chapter when and only when the federal share of just compensation prescribed in the Highway Beautification Act of 1965 and the Federal-Aid Highway Act of 1968 is available to the State of Maine or the Maine Legislature makes a specific appropriation and such acquisition shall be in accordance with a priority to be established by the commission.

7. Police power; amortization. When the federal share of just compensation for the removal of nonconforming outdoor advertising signs as prescribed in the Highway Beautification Act of 1965 and the Federal-Aid Highway Act of 1968 is not available to the State of Maine or when the immediate removal of nonconforming outdoor advertising signs is not required but removal via regulation over an extended period of time is satisfactory, the commission is authorized to use the police power of the State to establish a reasonable amortization period which will be long enough to allow recoupment of the capital investment which these nonconforming signs represent but which contemplates that at the end of this period the nonconforming sign will be removed by the owner without compensation. The length of the amortization period may vary for different types of signs but in no case shall it be longer than 5 years.  .   .   .

As pointed out in the Referee's report, it was administratively determined within the Maine Department of Transportation that signs erected between October 22, 1965, and October 1, 1969, would be removed pursuant to § 2719(7) since federal funds were not available to compensate the various sign owners. The Referee found that "signs in all pertinent respects similar and in many instances virtually identical" had been classified compensable or noncompensable solely on the basis of the availability of federal funds. He concluded that

[a]n arbitrary classification which in effect affords to one group of sign owners full monetary compensation on top of full amortization while denying to owners of virtually identical signs anything more than a more limited opportunity to amortize their signs cannot be justified where

4. Former Section 2719 can now be found at 23 M.R.S.A. §§ 1915–1917 (Cum.Supp.1978). § 1917(3) specifically provides:

3. Interpretation of chapter. Nothing in this chapter shall be interpreted to alter, abridge or in any way interfere with any duty or obligation of a sign owner to remove signs which were nonconforming and illegal prior to January 1, 1975, under the United States Code, Title 23, section 131, as enacted by Public Law 89–285, 89 Congress S. 2084, the 'Agreement for carrying out National Policy relative to Control of Outdoor Advertising in Areas adjacent to the National System of Interstate and Defense Highways and the Federal-Aid Primary System' dated December 27, 1967, and as amended on January 3, 1968, executed by and between the United States of America and the State of Maine, under the Maine Revised Statutes, Title 32, sections 2711 to 2723.

The intent of this subsection is to preclude any presumption that this chapter is intended to extend the period of use of any sign which became nonconforming and illegal before January 1, 1975, under the state agreement of December 27, 1967, as amended January 3, 1968, and Title 32, sections 2711 to 2723.

its obvious sole purpose is to protect the 'public purse' and it bears no 'substantial relation to the public purpose sought to be accomplished.'

He therefore held that former Section 2719(7), as applied to the defendant, violated the Equal Protection Clause of the Fourteenth Amendment.

We do not agree.

The United States Supreme Court has held that "[s]tatutes create many classifications which do not deny equal protection; it is only 'invidious discrimination' which offends the Constitution." *Ferguson v. Skrupa,* 372 U.S. 726, 732, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The line between permissible and invidious classifications, excepting cases dealing with a "suspect" classification or a "fundamental" interest, is determined by the rules set out in *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911), namely:

1. The equal-protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. . . .

■ Our Court has made clear that a classification must not be arbitrary. Inequality of treatment is not forbidden, however, if it rests upon an actual difference bearing some substantial relation to a proper public purpose which is sought to be accomplished by such discrimination. *State v. Norton,* Me., 335 A.2d 607, 614 (1975); *Portland Pipe Line Corp. v. Environmental Improvement Commission,* Me., 307 A.2d 1, 22 (1973).

Our task then is to determine whether the legislative classification here between compensable and noncompensable signs meets this test. The Legislature in 1969 enacted a law relating to outdoor advertising "in order to promote maximum safety, comfort and well-being of the highway user, to protect the public investment in highways, to preserve and enhance the natural scenic beauty or aesthetic features of highways and to prevent unreasonable distraction." P.L.1969, ch. 257, § 2711. The Legislature was well aware that such legislation did not come without a price tag. The Legislature was induced to act, however, by the fact that the federal government would bear seventy-five per cent of the cost of removing most signs. 23 U.S.C. § 131(g). With this in mind the Legislature enacted a system of regulation designed to provide maximum control of outdoor advertising at the least cost to the taxpayer. In order to insure that the cost to the State would be minimal, the Legislature specifically provided that the State could use its power of eminent domain to remove nonconforming signs (compensable signs under § 2719(6)) "when and only when" the federal share of compensation was available or when the Legislature made a "specific appropriation" for such an acquisition. P.L. 1969, ch. 257, § 2719(6). The Legislature further provided that when the federal share of compensation was not available, regulation of outdoor advertising signs (noncompensable signs under § 2719(7)) via the State's police power would be appropriate. It is clear that the purpose of this legislation was twofold—(1) to control outdoor advertising, and (2) to protect the State treasury against the cost of such control. These two goals were inextricably joined.

The United States Supreme Court has acknowledged that a state has a valid interest in "preserving the fiscal integrity of its programs" and, therefore, "it may legitimately attempt to limit its expenditures" for any program. *Graham v. Richardson,* 403 U.S. 365, 374–75, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971); *Shapiro v. Thompson,* 394 U.S. 618, 633, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). In both *Graham* and *Shapiro,* however, the Supreme Court held unconstitutional, on equal protection grounds, state statutory provisions involving the denial of welfare assistance to new residents and aliens who did not meet certain residency requirements. We believe the instant case is distinguishable. Both *Graham* and *Shapiro* were cases involving a "fundamental" interest (the right of interstate travel) and/or a "suspect" classification (alienage). The traditional standard of equal protection review was therefore abandoned by the Court in favor of a "strict scrutiny" test. Under this latter test, the states involved were unable to show that the legislation under attack served 'to promote a compelling governmental interest. The Maine legislation questioned here does not involve either a "fundamental" interest or a "suspect" classification.

■ The State has a legitimate interest in keeping the *costs* of its control of highway advertising to a minimum.[5] We cannot say that a classification scheme which was adopted to accomplish this goal was arbitrary because all sign owners affected by the legislation were not treated alike. As the Supreme Court held in *Lindsley, supra,* a classification having some reasonable basis does not offend the Equal Protection Clause because it results in some inequality. Nor do we find the classification arbitrary because it discriminates between the rights of owners of signs erected between October, 1965, and October, 1969, and the rights of owners of signs erected at some other time. *Cf. Williams v. Walsh,* 222 U.S. 415, 32 S.Ct. 137, 56 L.Ed. 253

(1912); *Sperry & Hutchinson Co. v. Rhodes,* 220 U.S. 502, 31 S.Ct. 490, 55 L.Ed. 561 (1911).

The entry is:

Appeal sustained.

Judgment set aside.

Remanded to the Superior Court for further proceedings consistent with the opinion herein.

WERNICK, DELAHANTY and GODFREY, JJ., concurring.

POMEROY, J., and DUFRESNE, A. R. J., dissenting.

POMEROY, Justice, dissenting.

I respectfully dissent.

I regret I am unable to agree with the majority opinion.

The statute which formed the basis of the action taken in this case had as its purpose to promote maximum safety, comfort and well-being of the highway, to protect the public investment in highways, to preserve and enhance the natural scenic beauty or aesthetic features of highways and to prevent unreasonable distraction.

Under the terms of the Federal Highway Beautification Act, 23 U.S.C. § 131 (as it was at the time of the action taken in this case) a federal contribution was available to the State for the payment of "just compensation" upon the removal of outdoor signs which were (1) lawfully in existence on the date of enactment of this sub-section, (2) those lawfully on any highway made a part of the interstate or primary system on or after the date of enactment of this system on or after the date of enactment of this subsection and before January 1, 1968, and (3) those lawfully erected on or after January 1, 1968.

A "hiatus" was created. No federal contribution was provided for payment of compensation for signs erected between October 22, 1965 and January 1, 1968.[1]

---

5. *See Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974).

1. A recent amendment to a federal act has eliminated the hiatus and made all the non-con-

forming signs here in controversy eligible for federal sharing of "just compensation".

In order for the State to avoid having to shoulder the entire cost of removal of those signs erected in the "hiatus" period it was administratively determined that those signs erected in that period should be ineligible for "just compensation".

All signs in controversy are similar and in most instances virtually identical to those classified as compensable.

There was no substantial difference in the location of the compensable and the non-compensable signs. As the referee pointed out

Since at the time of taking of the compensable signs all of them had been in existence longer than the non-compensable signs, the classification obviously did not rest on any decision as to which signs had been truly amortized and which had not.

The majority opinion concludes that a classification based wholly on the fact that no federal subsidy was available for the payment of "just compensation" for the removal of those signs erected in the "hiatus" period is a reasonable and proper classification.

I disagree.

In *Re Milo Water Company,* 128 Me. 531, 537, 149 A. 299, 302 (1930), it is said

In determining the legality of classifications, the subject to be regulated, the character, extent, and purpose of the regulation, the classes of persons or corporations affected by the regulation may all be considered. One of the essential requirements, in order that the classification may not violate the constitutional guaranty as to equal protection of the law, is that it must be *natural* and not capricious and arbitrary. The law requires something more than a mere designation of characteristics which will serve to divide into groups. Arbitrary selection or mere identification can not be justified by calling it classification. The characteristics which can serve as a basis of a valid classification must be such as to show an *inherent* difference in the sub-

ject placed in separate classes which peculiarly requires and necessitates different or exclusive legislation with respect to them. A proper classification must embrace all who naturally belong to the class, or will possess a common disability, attribute, or qualification, and there must be some *natural* and *substantial* difference *germane to the subject and purposes of the legislation* between those within the class included and those whom it leaves untouched. (emphasis supplied)

I see no inherent difference in the signs classified as compensable and those classified as non-compensable.

I see no natural and substantial difference germane to the subject and purpose of the legislation.

The size of the signs is the same.

Their location relative to the highway is the same.

All have the same eye appeal and tendency to distract the driver on the highway.

I am satisfied the referee correctly labeled the administratively made classification "arbitrary". I agree with him entirely when he said

An arbitrary classification which in effect affords to one group of sign owners full monetary compensation on top of full amortization while denying to owners of virtually identical signs anything more than a more limited opportunity to amortize their signs cannot be justified where its obvious sole purpose is to protect the "public purse" and it bears no "substantial relation to the public purpose sought to be accomplished."

I would deny the appeal.

DUFRESNE, A. R. J., sat at oral argument as Chief Justice but retired prior to the preparation of the opinion. He has joined the dissenting opinion as Active Retired Justice.