415 So.2d 1312 (1982)
LAMAR-ORLANDO OUTDOOR ADVERTISING, Melweb Signs, Inc., Peterson Outdoor Advertising Corporation, Outdoor Advertising Art, Inc., and National Advertising Company, a Subsidiary Corporation of Minnesota Mining and Manufacturing Company, Appellants/Cross-Appellees,
v.
CITY OF ORMOND BEACH, a Municipal Corporation, Appellee/Cross-Appellant.
Nos. 80-526, 80-530.
District Court of Appeal of Florida, Fifth District.
June 9, 1982.
Rehearing Denied July 6, 1982.
Michael D. Martin, Lakeland, for appellant/cross-appellee Lamar-Orlando Advertising.
*1313 Gerald S. Livingston, Orlando, for appellants/cross-appellees Melweb Signs, Inc., Peterson Outdoor Advertising Corp., Outdoor Advertising Art and Nat. Advertising Co.
Fred S. Disselkoen, Ormond Beach, for appellee/cross-appellant.
SHARP, Judge.
Appellants are owners of outdoor advertising signs, or billboards, located on U.S. Highway # 1 (a federal aid primary highway) in the City of Ormond Beach, Florida. Their signs were lawfully erected and permitted by applicable State and Federal laws. In 1968, the City enacted an ordinance which made appellants' signs nonconforming and required that they be removed within ten years.[1] When appellants failed to remove their signs by 1978, the City sought a declaratory judgment to construe the ordinance and enforce removal of the signs. While the litigation was pending in the lower court, the City amended its sign ordinance by adopting a comprehensive zoning code. The parties amended their pleadings and stipulated that the court should construe and apply the new ordinance. It continued the ten year amortization period for removing appellants' nonconforming signs, and continued to prohibit appellants' signs within the City.[2] Section 200.00 of the Ordinance defines "billboard" and "off-site" signs as follows:

Sign, Billboard. Any sign that is erected and maintained by an advertising business or service for the purpose of advertised services, accommodations or activities that are not available on the premises on which the sign is located.

Sign, Off-Site. Any sign other than a billboard relating in its subject matter to the commodities, accommodations, services, or activities on premises other than the premises on which the sign is located.
"Sign, On-Site," which is not among the prohibited group, is defined as: "Any sign relating in its subject matter to the commodities, accommodations, services or activities on the premises on which it is located."
The lower court entered a final summary judgment in favor of the City, upholding the validity of Ormond's Ordinance against appellants' attacks on its constitutionality and its possible preemption by state and federal laws.[3] However, the court ruled in favor of the appellants that the enforcement remedy sought by the City had been preempted by section 479.15(3), Florida Statutes (1979).[4] We sustain the lower *1314 court in all respects, except for its conclusions regarding enforcement.
The parties raise four issues in this case:
I. Does an ordinance which prohibits all off-site advertising by billboards exceed the legitimate scope of a City's police-powers because it is based primarily on aesthetic considerations?
II. Does an ordinance which allows on-site advertising signs (including billboards within various limits), but which prohibits all off-site advertising signs (including billboards), constitute an unreasonable and hence unconstitutional classification?
III. Are the appellants entitled to receive compensation upon the forced removal of their signs?
IV. Do the Federal Highway Beautification Act and the Florida Outdoor Advertising Act preempt the power of the cities to enact ordinances regulating or prohibiting signs more strictly than those laws; and do they preempt the enforcement provision of the ordinance?
We will discuss each point in the balance of this opinion.

I.

DOES AN ORDINANCE WHICH PROHIBITS ALL OFF-SITE ADVERTISING BY BILLBOARDS EXCEED THE LEGITIMATE SCOPE OF A CITY'S POLICE-POWERS BECAUSE IT IS BASED PRIMARILY ON AESTHETIC CONSIDERATIONS?
The appellants argue that prohibition of billboards by a city's zoning ordinance throughout the entire city exceeds the city's police-power because the prohibition must be justified on aesthetic grounds rather than public safety, health and welfare. Earlier in the 20th century aesthetics was deemed by some courts as a suspect or second-rate basis for the exercise of the police-power.[5] But urban living has become increasingly complex and has produced problems of crowding and blight unforeseen in those simpler times. Those changes have brought about an expanded view of the police power,[6] and most courts in this decade recognize aesthetics as a valid part of the general welfare for the preservation of which, the police power may legitimately be exercised.[7] Justice Douglas wrote in Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954), that:
The concept of the public welfare is broad and inclusive... . [T]he values it represents *1315 are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well balanced as well as carefully patrolled.
And in the Federal Supreme Court's most recent pronouncement on the subject, four Justices in the plurality opinion said there could be no "substantial doubt" that the "twin goals" of "traffic safety and appearance of the city are substantial governmental goals." Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 69 L.Ed.2d 800, 101 S.Ct. 2882, 2892, 69 L.Ed.2d 800 (1981).
In this case, the lower court found that the sign ordinance under attack sought to enhance Ormond's scenic qualities for aesthetic purposes, and that "as related to tourism, economic and cultural development, ... [the ordinance] has a legitimate purpose in advancement of the community as a social, economic, and political entity."[8]
The record shows that the City of Ormond Beach is primarily a residential community which contains some commercial areas but no heavy industry, and tourism is one of its primary businesses. It has several buildings and places of historic interest and contains much natural scenic beauty. In communities like Ormond, the Florida Courts have recognized aesthetics as a valid basis for zoning and sign ordinances, such as the one involved in this case.[9] In Merritt v. Peters, 65 So.2d 861 (Fla. 1953), the Florida Supreme Court sustained the validity of a zoning ordinance which limited the size of signs in a special business district in Miami. The court held:
We have no hesitancy in agreeing with him that the factors of health, safety, and morals are not involved in restricting the proportions of a sign board, but we disagree with him in his position that the restriction cannot be sustained on aesthetic grounds alone.
65 So.2d at 862. Most recently, our Supreme Court has held aesthetics alone is a legitimate justification for the exercise of the police power in this context. City of Lake Wales v. Lamar Advertising Association, 414 So.2d 1030 (Fla. 1982).
The appellants argue that although aesthetics may be a valid basis today for limiting or regulating signs, it is not a sufficiently strong ground to prohibit them. Most courts which have considered this issue have rejected making any distinction between the power to regulate and the power to prohibit, with regard to the scope of the police power or legislative discretion given cities to pass zoning ordinances.[10]
*1316 However, the Florida Supreme Court in Sunad, Inc. v. City of Sarasota, 122 So.2d 611 (Fla. 1960), suggested that zoning for aesthetic purposes may fail if it has the effect of putting a person "out of business" or severely "crippling" his business. In this case the record shows that the appellants do business on a multi-state basis, and that less than one percent of their respective gross incomes will be affected by Ormond's ordinance. We conclude the appellants have failed to carry their burden to show the ordinance exceeds the scope of the City's police powers.[11]

II.

DOES AN ORDINANCE WHICH ALLOWS ON-SITE ADVERTISING SIGNS (INCLUDING BILLBOARDS WITHIN VARIOUS LIMITS) BUT WHICH PROHIBITS ALL OFF-SITE ADVERTISING SIGNS (INCLUDING BILLBOARDS), CONSTITUTE AN UNREASONABLE AND HENCE UNCONSTITUTIONAL CLASSIFICATION?
The appellants argue that it is unreasonable and discriminatory[12] for an ordinance to permit on-site advertising signs under circumstances where the same kinds of off-site advertising signs are prohibited. Ormond's earlier Ordinance No. 68-3 prohibited all "billboard type signs",[13] which were generally described as signs which advertised "goods or services not sold or available on the premises on which the sign is located."[14] Although it may have been debatable under Ordinance No. 68-3 whether on-site billboards were also barred, the Amended Ordinance No. 78-35, which controls this case, makes it very clear that the term "billboards" only means off-site advertising signs, and only "billboards" and other kinds of off-site advertising signs are completely prohibited.[15]
Most state courts that have considered the question of whether or not off-site advertising signs can be treated differently than on-site signs have concluded there are practical and valid distinctions between the two kinds of signs, justifying their separate classification.[16] Some courts reason that since the discrimination does not involve a "suspect" class, the proper judicial measure is whether or not there is any reasonable basis for the classification, and if there is, it should be upheld.[17] In State v. National Advertising Co., 387 A.2d 745, 750 (Me. 1978), the court quoted the U.S. Supreme Court in Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 55 L.Ed. 369, 31 S.Ct. 337 (1911):
A classification having some reasonable basis does not offend against that clause [14th Amendment] merely because it is not made with mathematical nicety, as because in practice it results in some inequality... . When the classification in such a law is called in question, if any state of facts reasonably can be conceived *1317 that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed... One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.
Merely pointing out the discrimination as was done in this case, will not suffice.
Other courts have frankly taken judicial notice that off-site advertising is more intrustive and obnoxious than on-site advertising, and have accorded cities the right to prohibit or regulate off-site more stringently than on-site.[18] In John Donnelly & Sons v. Campbell, 639 F.2d 6 (1st Cir.1980), the court held the allowance of on-site advertising where off-site was prohibited did not invalidate the statute's "aesthetic position." It said the on-site business had already "violated" the landscape, and little more damage would result from the allowance of a sign, where the statute also regulated the size and placement of on-site advertising.
In Ghaster Properties, Inc. v. Preston, 176 Ohio St. 425, 200 N.E.2d 328 (1964), the court distinguished off-site advertising as taking advantage of an opportunity to intrude upon the vision of motorists on public roads rather than exercising natural rights inherent in the land itself.
The right asserted is not to own and use land or property, to live, to work, or to trade... . [I]ts main feature is the superadded claim to use private land as a vantage ground from which to obtrude upon all the public traveling upon highways, whether indifferent, reluctant, hostile or interested, an unescapable propaganda concerning private business with the ultimate design of promoting patronage of those advertising. Without this superadded claim, the other rights would have no utility in this connection...
200 N.E.2d at 334, quoting with approval from, General Outdoor Advertising Co. v. Department of Public Works, 289 Mass. 149, 193 N.E. 799 (1935).
The court in United Advertising Corp. v. Metuchen, 42 N.J. 1, 198 A.2d 447 (1964) declared that on-site advertising was more tolerable than off-site, because it was part of the business being operated on the land, and the sensibilities of the owners and neighbors would offer a restraint in many cases, which off-site advertisers would not have.
There are obvious differences between an on-premises sign and an off-premise sign. Even if the baleful effect of both be in fact the same, still in one case the sign may be found tolerable because of its contribution to the business or enterprise on the premises. The hurt is thus supported by the need or gain not present in the case of the off-premise sign. This difference, it seems to us, suffices to support the classification. 198 A.2d at 450.
Recently, the United States Supreme Court also considered this issue of reasonable classification in Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). One of the constitutional challenges to San Diego's ordinance was that it allowed on-site advertising where it forbad off-site advertising. Confirming its prior pronouncements[19] the court held that the City could ban off-site billboards for traffic safety and aesthetic reasons.
In the first place, whether on-site advertising is permitted or not, the prohibition of off-site advertising is directly related to the stated objective of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits on-site advertising. Second, the City may believe that off-site advertising with its periodically changing *1318 content, presents a more acute problem than does on-site advertising.
101 S.Ct. at 2894. The Court ultimately held the ordinance unconstitutional because the ordinance violated the First Amendment. In this case, appellants have neither appealed nor briefed the First Amendment issue, and we decline to consider it.[20]
The appellants argue that Sunad, Inc. v. City of Sarasota, 122 So.2d 611 (Fla. 1960) established the rule in Florida that it is unconstitutional because unreasonable and discriminatory, to treat off-site advertising differently than on-site. It is not clear that Sunad stands for that proposition, although our sister court has read Sunad in this manner.[21] In Sunad the city ordinance discriminated between on and off-site advertising signs, but it also discriminated between the sizes of wall and other kinds of signs in both categories. Although the Court cited no precedents, Sunad is consistent with Eskind v. City of Vero Beach, 159 So.2d 209 (Fla. 1963) where an ordinance which discriminated between the kinds of on-site advertising permissible was declared unconstitutional. Vero's ordinance forbad on-site advertisement of motel rates, but allowed all other kinds of motel advertising, such as "TV; A/C; pool, etc." The court in Eskind held the ordinance restricted competition between the economy and luxury motels in Vero, thereby damaging a segment of a class of business and favoring another, without any valid reason for doing so.
In Rotenberg v. City of Ft. Pierce, 202 So.2d 782 (Fla. 4th DCA 1967), the court upheld an ordinance requiring junkyards to be screened. In reply to the argument that the junkyard business was being singled out and unreasonably burdened, the court said:
A statute enacted in the exercise of the police power need not apply equally to all persons in the state but only to all persons similarly circumstanced. (Emphasis supplied).
202 So.2d at 785. Other Florida appellate courts have indicated they do not think on-site and off-site advertisers are "similarly circumstanced"[22] and neither do we.
We agree with the lower court's analysis of this issue. Judge John Upchurch held:
Sunad ... examined whether selective prohibitions within the category of non-point-of-sale locations constituted an unreasonable and discriminatory classification system. Wall signs were permitted at non-point-of-sale locations. They could be 300 square feet in size. A sign of the same size on a billboard was prohibited. The court saw no rational basis to discriminate against billboards and in favor of wall signs at non-point-of-sale locations. Hence the pronouncement that the ordinance was unreasonable and discriminatory.
Contrasted with the Sarasota ordinance, the Ormond Beach ordinance is a model of clarity. No off-site advertising is permitted, period. The prohibition is uniformly applied to all types of off-site (non-point-of-sale) advertising.
* * * * * *
It is illogical and unreasonable to be forced to link the concept of off-site advertising and point-of-sale advertising when discussing regulation.... It is absurd to think that an appropriate governmental authority cannot regulate off-site advertising without simultaneously *1319 regulating store-front signs in identical fashion.
Since the bulk of this opinion was written, our Supreme Court has made it clear that treating on-site and off-site signs differently solely on the basis of aesthetics is constitutionally permissible. City of Lake Wales v. Lamar Advertising Association, 414 So.2d 1030 (Fla. 1982).

III.

ARE THE APPELLANTS ENTITLED TO RECEIVE "COMPENSATION" UPON THE FORCED REMOVAL OF THEIR SIGNS?
We do not reach the question of whether or not our constitutions[23] require that appellants be compensated for the removal of their nonconforming signs[24] because it is clear that under both the state and federal laws, compensation must be paid appellants.
Section 479.24(1) provides:
Compensation shall be paid upon the removal of all signs lawfully in existence on December 8, 1971 or signs lawfully erected which later become nonconforming.
In addition section 479.15(2) provides:
No municipality, county, local zoning authority, or other political subdivision shall remove, or cause to be removed, any advertisement or advertising structure without paying compensation in accordance with s. 479.24(1).
The appellants' signs were erected prior to 1971, and were lawful and permitted under Chapter 479. They became "nonconforming" in 1968 when Ormond passed its first Ordinance, but they were not erected illegally. It seems clear under this statute that appellants must be paid compensation upon the removal of their signs.[25]
Even if Florida's statute did not require payment of just compensation, recent amendments to the Federal Highway Beautification Act appear to require such payment for removal of signs along federal highways. The amended section 23 U.S.C. § 131 (g), provides:
Just compensation shall be paid upon the removal of any outdoor advertising sign, display or device lawfully erected under state law and not permitted under subsection (c) of this section, whether or not removed pursuant to or because of this section. (Emphasis supplied).
The amendment was apparently intended to overcome a decision of the Federal Highway Administration holding a state could not be penalized for failure to have effective control of outdoor advertising when a municipality by general zoning ordinance provided for the removal of signs adjacent to federal highways without payment of just compensation.[26]

*1320 IV.

DO THE FEDERAL HIGHWAY BEAUTIFICATION ACT AND THE FLORIDA OUTDOOR ADVERTISING ACT PREEMPT THE POWER OF THE CITIES TO ENACT ORDINANCES REGULATING OR PROHIBITING SIGNS MORE STRICTLY THAN THOSE LAWS; AND DO THEY PREEMPT THE ENFORCEMENT PROVISION OF THE ORDINANCE?
The Federal Highway Beautification Act[27] was enacted by Congress in 1965 for the purpose of controlling outdoor advertising signs and devices along the federal interstate and primary highway systems, "to promote the safety and recreational value of public travel, and to preserve National beauty." The Act embodied a "carrot and stick" approach to the states to handle and enforce the federal guidelines and regulations, by requiring the states to establish "effective control" over signs within 660 feet of the road right of way by 1968 or face a ten percent reduction in federal highway funds appropriated for the respective state.[28] Another provision entitled the states who entered into an agreement with the Secretary of Commerce (now the Secretary of Transportation) to control outdoor advertising, to receive bonus payments. Florida complied by passing Chapter 479 and entering into the requisite Agreement.[29]
It seems clear that the federal act contemplates that the states may pass statutes and the cities ordinances, which are more stringent (but not less) than the federal provisions and regulations. Section 23, U.S.C. § 131(k) expressly states:
Subject to compliance with section (g) of this section for the payment of just compensation, nothing in this section shall prohibit a state from establishing standards imposing stricter limitations with respect to signs, displays, and devices on the Federal-aid highway systems than those established under this section.
Section 23 U.S.C. § 131(d) also contemplates some deviation from the federal guidelines in areas subject to industrial or commercial zoning. The Act contains no enforcement mechanisms, depending clearly on the states to carry out the federal regulations, except for the requirement discussed in Part III of this opinion regarding payment of compensation.
The federal courts which have considered this issue, have all concluded that no preemption as to stricter regulation was intended or imposed on state statutes or municipal ordinances, by the Federal Act. See Art Neon Co. v. The City and County of Denver, 488 F.2d 118 (10th Cir.1973); E.B. Elliot Advertising Co. v. Metropolitan Dade County, 425 F.2d 1141 (5th Cir.1970). State courts have uniformly reached a similar conclusion.[30] Our sister court also reached this conclusion in City of Lake Wales v. Lamar Advertising Association, 399 So.2d 981 (Fla. 2d DCA 1981), reversed on other grounds, 414 So.2d 1030 (Fla. 1982).
We agree.
The question of whether the state statute (Ch. 479) preempts the field of regulation of signs on highways has been resolved in a similar fashion.[31] The statute contemplates that no zoning ordinance may stand that is less stringent than Chapter 479. Section 479.15(1) provides:

*1321 No zoning board or commission nor any other public officer or agency shall permit any advertisement or advertising structure which is prohibited under the provisions of this chapter... .
But Chapter 479 clearly contemplates that municipalities may enact stricter rules than those imposed by the state law, because the final clause of section 479.15(1) prohibits the Department of Transportation from permitting any advertisement which is "prohibited by any other public board, officer or agency in the lawful exercise of its or their powers." Further, section 479.155 expressly provides:
The provisions of Ch. 78-138, laws of Florida, shall not be deemed to supersede the rights and powers of counties and municipalities to establish outdoor advertising or sign ordinances.
Other state courts have similarly concluded their statutes do not prevent enforcement of stricter zoning ordinances.[32] We agree and the lower court also reached this conclusion.
The lower court concluded, however, that Chapter 479 preempts the enforcement of municipal zoning ordinances, although not the passage of stricter regulations. It relied on the wording of section 479.15(3) which provides:
(3) The removal of outdoor advertisements or advertising structures adjacent to roads or highways on the federal interstate or primary highway system shall be the sole responsibility of the Department of Transportation. (Emphasis supplied).
Other provisions of Chapter 479 clearly contemplate that municipalities have enforcement powers to carry out their own ordinances. Section 479.15(1) refers to signs "prohibited by" cities or other public bodies, and section 479.15(2) provides "No municipality, county, local zoning authority, or other political subdivision shall remove, or cause to be removed, any advertisement ..." (Emphasis supplied). Further, section 479.10 entitled "Removal" requires that a sign owner remove his own sign within thirty days after expiration of his permit. This section is further elaborated upon by Fla. Admin. Code Rule 14-10.05(2)(h).
The construction of a statute should seize upon the most reasonable and logical interpretation where two possibilities vie for selection.[33] Here it does not appear reasonable that the state would allow municipalities to more stringently regulate signs in their jurisdictions and then deprive them of any method of enforcement. That is tantamount to giving a right without a remedy, which in legal currency is worth nothing. We conclude that the City of Ormond Beach has the right to enforce its zoning ordinance in this case either by calling on the Department of Transportation to remove the signs, or by obtaining a court order directing the owners to remove their own signs.
For the reasons stated in this opinion the lower court's judgment is affirmed in part; and reversed in part.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
ORFINGER, J., concurs.
COWART, J., dissents with opinion.
COWART, Judge, dissenting:
First, I cannot agree that our government can legally regulate, restrict and prohibit the lawful use of private property on the basis of aesthetics, that is, on the basis of what a governmental body, official or employee may perceive as having, relating to, or dealing with what is beautiful and what is not. What qualifications does government have in that branch of philosophy dealing with the nature of the beautiful and with judgments concerning beauty? Which philosophical theory or concept of art or beauty will be used? Aesthetics is a *1322 most subjective field[1] and, as a basis for the exercise of regulatory police power, will, when coupled with other misapplied zoning concepts, serve as an excuse for the most arbitrary and despotic acts of government.
Second, assuming that aesthetics is a proper goal for regulation, there is no distinction between on-site and off-site signs related to aesthetics. Certainly, practical, functional distinctions may be made between on-site and off-site signs, but the only real way to distinguish between the two is through their content, as the ordinance itself does. Assuming that "aesthetics" is a proper goal of a city ordinance, what possible relationship can the sign's message have to the sign's aesthetic impact? Off-site signs are not necessarily or inherently more ugly, intrusive or obnoxious than on-site signs. Consequently, off-site sign owners are denied equal protection of the law when compared with similarly situated owners of on-site signs.[2] Commercial speech is protected by the First Amendment, albeit to a lesser degree than noncommercial speech, and the regulation, and any distinction made by the regulation, must directly advance the governmental interest asserted, in this case aesthetics.[3] As the ordinance's content-based classification bears no relation to the interest asserted, the ordinance must fall. Sophisticated arguments making immaterial distinctions between on-site and off-site signs serve only to mask the real objective of the regulation. On-site signs are generally owned by the on-site business which is owned by, employs and serves the local citizenry, whereas off-site signs are most frequently owned by non-resident sign companies. The aim of the ordinance is to outlaw signs owned by non-residents in favor of those owned by residents, obviously a constitutionally impermissible goal.
Third, assuming that aesthetics is a proper goal for regulation and that on-site and off-site signs can be validly distinguished on the basis of aesthetics, which is as far as any case has gone,[4] the ordinance does not even treat all off-site signs the same. All signs which advertise matters not available on the premises on which the sign is located (off-site signs) are prohibited. However, the ordinance makes a distinction between "billboards," defined as off-site signs erected and maintained by an advertising business or service, and all other off-site signs. Owners of these latter are given a five year period for removal of the sign; billboards must be immediately removed. Just as there is no difference in beauty between two identical signs, one relating to an on-site business and the other not, there is no aesthetic distinction between two identical signs, both advertising off-site matters, where one is erected and maintained by an advertising business and the other is maintained by another type of business, a private person or a non-business entity. Since the distinction is drawn on the basis of who owns the sign, the ordinance constitutes a blatant denial of equal protection.
Fourth, if the ordinance outlawing billboards is upheld, I agree that the billboard owner should be compensated for deprivation *1323 of his property. I suggest, however, that this is a recognition of a "taking" of not only the billboard owner's property, but also the valuable property right of each and every landowner in the city to lease space to a sign company for maintenance of a sign. Such a taking should be by eminent domain and not by a zoning ordinance and each landowner should be compensated for the taking of this right.
Fifth, by effectively prohibiting all signs, save those advertising on-site business matters, the regulation deprives landowners of their First Amendment freedom to express to the world their views concerning philosophy, politics or religion. Signs advertising such messages are condemned even more heavily by the ordinance if the speaker hires a commercial advertising company to erect and maintain a sign carrying his message. Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), held that an ordinance banning billboards which includes signs containing "non-commercial" messages protected under the First Amendment within its prohibition is unconstitutional as violative of the First Amendment.
This ordinance well illustrates the danger of permitting governmental zoning authority to be based on anything so nebulous as aesthetics, which concept creates but a cover under which any manner of arbitrary discrimination can exist that would not otherwise be permitted if asserted on its true basis. I would hold the ordinance unconstitutional.
NOTES
[1] Section 2, City of Ormond Beach Ordinance No. 68-3 defined "outdoor advertising signs" as: "signs erected and maintained by an advertising business or service in the form of a ground, wall, or roof sign, upon which advertising matter may be displayed, generally advertising goods or services not sold or available on the premises on which the sign is located. These types of signs are generally referred to as billboards, the surface of which is sold, rented or leased, for the display of advertising material." Section 8(5) prohibited "billboard type signs" within the city limits, "except for construction or subdivision signs, as permitted in this ordinance."
[2] City of Ormond Beach Ordinance No. 78-35 prohibits various kinds of signs within the city limits:

§ 826.03 Prohibited Signs
It shall be a violation of this Ordinance to erect or maintain the following signs:
A. Signs not specifically listed in the District Regulations and signs erected on public property or over public rights-of-way except as permitted in Section 825.01(j) and (k);
B. Signs attached to or painted onto a vehicle parked on a public thoroughfare for the sole purpose of advertising.
C. Portable signs;
D. Billboards;
E. Off-site signs;
F. Revolving signs;
G. Flashing signs excluding time and temperature signs that do not exceed a 75 square foot area;
H. Snipe signs;
I. Wind signs;
J. Animated signs;
K. Signs that are painted to any part of a building.
[3] Ch. 479, Fla. Stat. (1979) and 23 U.S.C. § 131.
[4] § 479.15(3) provides:

The removal of outdoor advertisements or advertising structures adjacent to roads or highways on the federal interstate or primary highway systems shall be the sole responsibility of the Department of Transportation. (Emphasis supplied).
[5] See the discussion in Murphy v. Town of Westport, 131 Conn. 292, 40 A.2d 177 (1944).
[6] See Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887). To illustrate how changes in living conditions from decade to decade bring about changes in the legitimate scope of the "police power," the court in Mugler discussed an older San Francisco ordinance involved in Barbier v. Connolly, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923 (1884), which prohibited, within certain districts of the city, washing and ironing in public laundries and wash houses between 10 p.m. and 6 a.m.
[7] John Donnelly & Sons v. Campbell, 639 F.2d 6 (1st Cir.1980); E.B. Elliott Advertising Co. v. Metropolitan Dade County, 425 F.2d 1141 (5th Cir.1970); Metromedia, Inc. v. San Diego, 26 Cal.3d 848, 164 Cal. Rptr. 510, 610 P.2d 407 (1980) rev'd on other grounds, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); Veterans of Foreign Wars v. Steamboat Springs, 195 Colo. 44, 575 P.2d 835 (1978); Mississippi Highway Comm. v. Roberts Enterprises, Inc., 304 So.2d 637 (Miss. 1974); United Advertising Corp. v. Metuchen, 42 N.J. 1, 198 A.2d 447 (1964); Suffolk Outdoor Advertising Co. v. Hulse, 43 N.Y.2d 483, 402 N.Y.S.2d 368, 373 N.E.2d 263 (1977); Modjeska Sign Studios, Inc. v. Berle, 43 N.Y.2d 468, 402 N.Y.S.2d 359, 373 N.E.2d 255 (1977); Cromwell v. Ferrier, 19 N.Y.2d 263, 279 N.Y.S.2d 22, 225 N.E.2d 749 (1967); Newman Signs, Inc. v. Hjelle, 268 N.W.2d 741 (N.D. 1978); Lubbock Poster Co. v. City of Lubbock, 569 S.W.2d 935 (Tex.Civ.App. 1978). But see, Metromedia, Inc. v. City of Des Plaines, 26 Ill. App.3d 942, 326 N.E.2d 59 (1975).
[8] Ordinance No. 68-3 stated its legitimate purpose was:

to protect and preserve the character and appearance of the several districts within the City of Ormond Beach... .
Ordinance No. 78-35 (the comprehensive city-wide zoning ordinance) stated its purpose was:
to lessen congestion in the streets, promote health, safety and the general welfare, to provide adequate light and air, to prevent the overcrowding of land. .. . to preserve the existing environment that realizes the greatest possible use and enjoyment of land on individual properties, balanced against the necessary protection of the values of buildings and land and the use and enjoyment of land on adjacent properties, with the object of promoting and protecting the public welfare through the regulation of land use and the process of land development.
[9] We question whether only beautiful or unblighted communities should be allowed to exercise their "police powers" to accomplish aesthetic goals. Once marred, should a community be forever condemned to ugliness? Attracting the influx of new business or residents bears just as important an impact on a city's economic welfare as maintaining an already established tourist trade. See Sunad, Inc. v. City of Sarasota, 122 So.2d 611 (Fla. 1960); Moviematic Industries Corp. v. Board of County Commissioners, 349 So.2d 667 (Fla. 3d DCA 1977); Rotenberg v. City of Ft. Pierce, 202 So.2d 782 (Fla. 4th DCA 1967); State ex rel. Boozer v. City of Miami, 193 So.2d 449 (Fla. 3d DCA 1967).
[10] Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); St. Louis Poster Advertising Co. v. St. Louis, 249 U.S. 269, 39 S.Ct. 274, 63 L.Ed. 599 (1919); E.B. Elliott Advertising Co. v. Metropolitan Dade County, 425 F.2d 1141 (Fla. 5th Cir.1970); Metromedia, Inc. v. City of San Diego, 26 Cal.3d 848, 164 Cal. Rptr. 510, 610 P.2d 407 (1980), rev'd on other grounds, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); Inhabitants of Boothbay v. National Advertising Co., 347 A.2d 419 (Me. 1975); Suffolk Outdoor Advertising Co. v. Hulse, 43 N.Y.2d 483, 402 N.Y.S.2d 368, 373 N.E.2d 263 (1977); Cromwell v. Ferrier, 19 N.Y.2d 263, 279 N.Y.S.2d 22, 225 N.E.2d 749 (1967). But see Combined Communication Corp. v. City and County of Denver, 189 Colo. 462, 542 P.2d 79 (1975); Hav-A-Tampa Cigar Co. v. Johnson, 149 Fla. 148, 5 So.2d 433 (1941).
[11] City of Miami Beach v. Ocean & Inland Co., 147 Fla. 480, 3 So.2d 364 (1941); Blank v. Town of Lake Clarke Shores, 161 So.2d 683 (Fla. 2d DCA 1964).
[12] U.S.Const. amend. V, XIV; Art. I, § 9, Fla. Const.
[13] § 8(5).
[14] § 2 Ord. 68-3.
[15] §§ 101.00, 826.039.04 Ord. 78-35.
[16] E.B. Elliott Advertising Co. v. Metropolitan Dade County, 425 F.2d 1141 (5th Cir.1970); Metromedia, Inc. v. City of San Diego, 26 Cal.3d 848, 164 Cal. Rptr. 510, 610 P.2d 407 (1980), rev'd on other grounds, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); Inhabitants of Boothbay v. National Advertising Co., 347 A.2d 419 (Me. 1975); Donnelly Advertising Corp. v. City of Baltimore, 279 Md. 660, 370 A.2d 1127 (1977). But see Metromedia, Inc. v. City of Des Plaines, 26 Ill. App.3d 942, 326 N.E.2d 59 (1975).
[17] See Lubbock Poster Co. v. City of Lubbock, 569 S.W.2d 935 (Tex.Civ.App. 1978).
[18] Veterans of Foreign Wars v. Steamboat Springs, 195 Colo. 44, 575 P.2d 835 (1978); John Donnelly & Sons, Inc. v. Outdoor Advertising Board, 369 Mass. 206, 339 N.E.2d 709 (1975); Cromwell v. Ferrier, 19 N.Y.2d 263, 279 N.Y.S.2d 22, 225 N.E.2d 749 (1967); Newman Signs, Inc. v. Hjelle, 268 N.W.2d 741 (N.D. 1978).
[19] St. Louis Poster Advertising Co. v. City of St. Louis, 249 U.S. 269, 39 S.Ct. 274, 63 L.Ed. 599 (1919).
[20] See State ex rel. Randall v. Miami Coin Club, 88 So.2d 293 (Fla. 1956); Brown v. City of Miami Beach, 54 So.2d 689 (Fla. 1951).
[21] City of Lake Wales v. Lamar Advertising Association, 399 So.2d 981 (Fla. 2d DCA 1981), rev'd in part, 414 So.2d 1030 (Fla. 1982); City of Naples v. Polk, 346 So.2d 1076 (Fla. 2d DCA 1977).
[22] Brazil v. Div. of Administration, State Dep't. of Transp., 347 So.2d 755 (Fla. 1st DCA 1977), disapproved on other grounds, LaPointe Outdoor Advertising v. Florida Dep't. of Transp., 398 So.2d 1370 (Fla. 1981); State ex rel. Boozer v. City of Miami, 193 So.2d 449 (Fla. 3d DCA 1967).
[23] U.S.Const. amend. V, XIV; Art. I, §§ 2, 9, Fla. Const.
[24] Some courts have held that amortization of nonconforming signs, if the period is reasonably long enough to allow the sign owner to recoup his investment, is a valid alternative to compensation. City of Doraville v. Turner Communications Corp., 236 Ga. 385, 223 S.E.2d 798 (1976); Inhabitants of Boothbay v. National Advertising Co., 347 A.2d 419 (Me. 1975); Donnelly Advertising Corp. v. City of Baltimore, 279 Md. 660, 370 A.2d 1127 (1977); Suffolk Outdoor Advertising Co. v. Hulse, 43 N.Y.2d 483, 402 N.Y.S.2d 368, 373 N.E.2d 263 (1977); Modjeska Sign Studios, Inc. v. Berle, 43 N.Y.2d 468, 402 N.Y.S.2d 359, 373 N.E.2d 255 (1977); Newman Signs, Inc. v. Hjelle, 268 N.W.2d 741 (N.D. 1978); Lubbock Poster Co. v. City of Lubbock, 569 S.W.2d 935 (Tex.Civ.App. 1978). However, the state statutes involved in those cases are different than Florida's. Other state statutes, like Florida's, preempt and require payment of compensation in spite of amortization provisions in the ordinances. Metromedia, Inc. v. City of San Diego, 26 Cal.3d 848, 164 Cal. Rptr. 510, 610 P.2d 407 (1980), rev'd on other grounds, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).
[25] See LaPointe Outdoor Advertising v. Florida Dep't. of Transp., 398 So.2d 1370 (Fla. 1981); Walker v. State Dep't. of Transp., 366 So.2d 96 (Fla. 1st DCA 1979).
[26] H.R.No. 1485, 95th Cong., 2d Sess. 1, 15, reprinted in [1978] U.S.Code Cong. & Ad.News 6575, 6591.
[27] 23 U.S.C. §§ 131, 135, 136.
[28] 23 U.S.C. § 131(b).
[29] Fla. Admin. Code Rule 14-10.09.
[30] City of Doraville v. Turner Communications Corp., 236 Ga. 385, 223 S.E.2d 798 (1976); State v. National Advertising Co., 387 A.2d 745 (Me. 1978); Donnelly Advertising Corp. v. City of Baltimore, 279 Md. 660, 370 A.2d 1127 (1977); Suffolk Outdoor Advertising Co. v. Hulse, 43 N.Y.2d 483, 402 N.Y.S.2d 368, 373 N.E.2d 263 (1977); Ackerley Communications, Inc. v. City of Seattle, 92 Wash.2d 905, 602 P.2d 1177 (1979).
[31] E.B. Elliott Advertising Co. v. Metropolitan Dade County; City of Lake Wales v. Lamar Advertising Association, 414 So.2d 1030 (Fla. 1982).
[32] City of Doraville v. Turner Communications Corp., 236 Ga. 385, 223 S.E.2d 798 (1976); Ackerley Communications, Inc. v. City of Seattle, 92 Wash.2d 905, 602 P.2d 1177 (1979).
[33] See In Re Ruff's Estate, 159 Fla. 777, 32 So.2d 840 (1947).
[1] Ormond Beach considers off-site signs to be "unaesthetic." In contrast, Miami requires every development in the downtown area to have "one or more graphic forms utilizing variable signs, lighting, banners, kinetic sculpture, fountains, and similar forms of animated images visible during day and night from Biscayne Boulevard." The Wall Street Journal, May 20, 1982, 1, col. 6, at 20, col. 1. To paraphrase a well-worn truth: "Aesthetics is in the eye of the commission."
[2] Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), merely held that the distinction did not violate the First Amendment. It did not consider whether the distinction violated constitutional equal protection guaranties.
[3] Central Hudson Gas & Electric Corp. v. Public Service Comm. of New York, 447 U.S. 557, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980).
[4] See, e.g., Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); City of Lake Wales v. Lamar Advertising Assoc., 414 So.2d 1030 (Fla. 1982).